**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PLYMOUTH COUNTY RETIREMENT ASSOCIATION, on Behalf of Itself and All Others Similarly Situated,  10 Cordage Park Circle, Suite 234, Plymouth, MA 02360 <br><br> Plaintiff, <br><br> v. <br><br> THE ADVISORY BOARD COMPANY, 2445 M Street NW, Washington DC, 20037 <br><br> ROBERT W. MUSSLEWHITE, 3033 University Terrace NW, Washington DC 20016 <br><br> MICHAEL T. KIRSHBAUM, 1450 Foxhall Road NW, Washington, DC 20007 <br><br> Defendants. | Civil Action No. <br><br> Judge: <br><br> **CLASS ACTION** |

## CLASS ACTION COMPLAINT

Plaintiff Plymouth Country Retirement Association ("Plaintiff") individually and on behalf of all other persons similarly situated, alleges the following against the Advisory Board Company ("Advisory Board" or the "Company"), its current Chief Executive Officer ("CEO") Robert W. Musslewhite ("Musslewhite"), and its current Chief Financial Officer ("CFO") and Treasurer Michael T. Kirshbaum ("Kirshbaum").  Advisory Board, Musslewhite, and Kirshbaum are collectively referred to as "Defendants."  Plaintiff makes these allegations based upon the investigation of its counsel which included a review, among other things, of United States

Securities and Exchange Commission ("SEC") filings; other regulatory filings and reports; securities analysts' reports and advisories about the Company; and news and media reports published about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE AND SUMMARY OF THE ACTION

1. This is a securities class action on behalf of purchasers of the common stock of Advisory Board between January 21, 2015 and February 23, 2016, both dates inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). As detailed herein, Defendants repeatedly represented during the Class Period that Advisory Board's integration of Royall & Company ("Royall") was proceeding smoothly and according to plan when, in reality, the integration was facing severe problems and Royall's CEO and CFO, who stayed with Advisory Board following the acquisition, had left the Company earlier than anticipated. Despite these integration issues, Defendants mislead investors by continuing to tout the acquisition and integration of Royall.

2. Advisory Board is a publicly traded consulting company that provides performance-improvement software and solutions to clients in the healthcare and education industries. The Company's stock trades on the NASDAQ stock market (the "NASDAQ") under the ticker symbol "ABCO."

3. Advisory Board's education market was launched in 2007 and serves a range of public and private colleges, universities, and K-12 schools and offers support in enrollment, student success, and academic operations. In fiscal year 2016, Advisory Board worked with more than 1,100 colleges and university members, conducted approximately 5,000 research

interviews, and maintained more than 450 million course records in the Company's student success analytic models. The education market offers services to members through three subscription programs: research programs, technology programs, and data-enabled services.

4.    On December 10, 2014, Advisory Board announced that it had signed a definitive agreement to acquire Royall & Company ("Royall"), a provider of strategic, data-driven student engagement and enrollment management, financial aid optimization, and alumni fundraising solutions. Advisory Board represented to investors that the acquisition provided a "fantastic platform for growth, expansion, and member value creation." Under the terms of the agreement, Advisory Board purchased Royall for $850 million, consisting of $750 million in cash and approximately $100 million in Advisory Board stock.

5.    On January 9, 2015, Advisory Board completed its acquisition of Royall. The final purchase price for the acquisition was approximately $871 million, consisting of $750 million in cash and $121 million in Advisory Board common stock.

6.    Defendants continued to tout the acquisition after the deal closed, representing to investors throughout the Class Period that the integration was "going very well" and was moving "more quickly than . . . planned."

7.    The truth, however, was that the integration of Royall had serious problems and that Royall's CEO and CFO left the Company shortly after the acquisition – facts which were known to Defendants but concealed from the market. While Defendants withheld this information from investors, Defendant Kirshbaum was selling tens of thousands of shares of Advisory Board common stock. Over the course of the Class Period, Kirshbaum sold 31,500 shares, generating proceeds of over $1.7 million.

3

8.    Eventually, the truth about the Royall Acquisition entered the market through two partial disclosures on August 4, 2015.  First, Defendants, for the first time, partially disclosed integration problems with Royall, including the departure of Royall's CEO and CFO during the previous quarter.  Second, Defendants revealed that when Royall was a private company, it had closed its books later than a public company and now that it was on the same schedule as Advisory Board there had been an "impact on when [Advisory Board was] able to begin recognizing revenue for certain contracts, especially for the June quarter."  Following these disclosures, Advisory Board's shares tumbled $12.37, or 20%, from $59.36 to $46.99.

9.    Analysts following the Company were stunned by these disclosures, but continued to believe the acquisition would be successful.  An August 4, 2015 Wells Fargo report explained, "Royall was distracted by the CEO/CFO leaving mid-quarter and saw contract value shrink sequentially during a key selling season. . . . While Royall has not gotten off to a great start, management is still very confident in the ROI for universities and wants to build a large business in higher education long-term.  We continue to believe this is a very good management team."  A Barclays analyst remarked that while the announcement had "cost management some credibility . . . we believe the fundamental strategy behind the Royall acquisition remains sound."

10.    On February 23, 2016, Defendants finally disclosed the financial impact of the poorly integrated Royall acquisition.  The Company issued a press release announcing a net loss of $101.8 million for the quarter ended December 31, 2015, and a goodwill impairment charge of $95.7 million related to Royall.  Defendants also disclosed that Royall ended 2015 with only 5%

revenue growth, well below Defendants' previous guidance that it would experience double-digit growth.

11.     Following the Company's February 23, 2016 disclosure, Advisory Board common stock plummeted approximately 27% throughout the February 24, 2016 trading day, closing at $26.50, down from the prior day's close of $36.29, on extremely high volume of 8.5 million shares.

## II.     JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

13.     This Court has jurisdiction over the subject matter of the federal securities claims pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Advisory Board's principal executive office is located in this District and Defendants Musslewhite and Kirshbaum reside in this District.  Many of the acts that constitute the violations of law complained of herein, including dissemination of materially false and misleading information to the investing public, occurred in and/or were issued from this District.

15.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

III.    **PARTIES**

16.     Plaintiff Plymouth County Retirement Association was established by statute in 1937.  During the Class Period, Plaintiff purchased shares of Advisory Board common stock, as set forth in Plaintiff's accompanying certification.  Those shares were artificially inflated at the time of purchase and Plymouth County Retirement Association has been damaged thereby.

17.     Defendant Advisory Board is a publicly traded consulting company that provides performance improvement software and solutions to its members in the healthcare and education industries.  The Company currently serves approximately 5,600 members.

18.     Defendant Robert W. Musslewhite has served as the Company's CEO since September 2008. Musslewhite joined the Company in 2003 and, prior to serving as CEO, held various executive roles in strategic planning and new product development.    In 2007, Musslewhite was named Executive Vice President and general manager in charge of software-based programs.    Prior to joining Advisory Board, Musslewhite worked for McKinsey & Company, an international consulting firm.

19.     Defendant Michael T. Kirshbaum has served as the Company's CFO since February 2006 and Treasurer since March 2007.  Kirshbaum joined the Company in 1998 and held various positions in the finance group, most recently serving as Senior Director of Finance.

20.     At times, Defendants Musslewhite and Kirshbaum are collectively referred to as the "Individual Defendants."

21.     Because of the Individual Defendants' positions with the Company, they had access to adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to

internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management, sales and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

22.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications and earnings calls, as alleged herein, are the collective actions of the narrowly defined group of defendants defined above as the Individual Defendants.  Each of the Individual Defendants as officers of the Company, by virtue of their high-level positions with the Company, directly participated in the management of Advisory Board, were directly involved in the day-to-day operations of the Advisory Board at the highest levels, and were privy to confidential proprietary information concerning Advisory Board and its business, operations, growth, financial statements and financial condition, as alleged herein.  Each acted on behalf of the Company and the actions of each, as alleged herein, can be imputed to the Company.  The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, knew or recklessly disregarded that the false and misleading statements described herein were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

23.     As officers and controlling persons of a publicly held company whose common stock was and is registered with the SEC pursuant to the Exchange Act, and was and is traded on

the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. The Individual Defendants were each provided with copies of the documents alleged herein to be misleading, including the Company's quarterly and annual filings and the prepared remarks for each of the Company's quarterly earnings conference calls, prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     <u>False and Misleading Statements and Omissions</u>

25.     On January 20, 2015, after market close, Advisory Board filed with the SEC a shelf registration statement on Form S-3ASR (File No. 333-201608). On the same day,

Advisory Board filed a preliminary prospectus supplement to the registration statement, pursuant to which Advisory Board offered 3,275,000 shares of its common stock and Royall offered 1,425,000 shares of Advisory Board common stock.

26.     On or about January 23, 2015, Advisory Board filed with the SEC a final prospectus supplement to the prospectus filed on January 20, 2015.  Pursuant to the final prospectus supplement, Advisory Board offered 3,650,000 shares of its common stock, Royall offered 1,050,00 shares of Advisory Board common stock, and the underwriters of the offering were granted an option to purchase up to an additional 705,000 shares of common stock from Royall Holdings.

27.     The registration statement and prospectus supplements (collectively the "Registration Statement") stated that Advisory Board preliminarily allocated $659 million of the Royall transaction to goodwill and included Royall's Consolidated Statements of Comprehensive Income for the years ended June 2012, 2013, and 2014.

28.     The statements in Paragraph 27 were false and misleading and omitted to disclose material facts because (1) the depiction of Royall's reported revenue for prior years failed to disclose that, as a private company, Royall could take longer to close its books than as a subsidiary of Advisory Board and that with its books open longer, Royall had been able to recognize revenue in prior years that it otherwise could not recognize once it became a part of Advisory Board; and (2) the amount of goodwill that Advisory Board allocated to Royall was lacking in a reasonable basis.

29.     On February 11, 2015, Advisory Board issued a press release announcing its financial results for the quarter and nine-month period ended December 31, 2014.  The Company

also provided 2015 financial guidance, expecting adjusted revenue of $780 million to $800 million, adjusted EBITDA of $170 million to $180 million, and non-GAAP earnings per diluted share of approximately $1.22 to $1.35.  The adjusted revenue guidance included $125 million to $130 million of Royall revenue, up from the Company's prior guidance of $121 million to $124 million of Royall revenue.

30.     That same day the Company held a quarterly earnings call with investors during which Defendant Musslewhite touted the success of the Royall integration:

> *Finally in terms of culture, fit and integration, everything is going very well*.  John Nester, Royall & Company's CEO, has been great to work with and his team is strong.  Obviously, we're only a few weeks in here, but there is a lot of positive momentum on both sides *and we are confident that this combination is going to yield great success*.

31.     The bolded and italicized statements in Paragraph 30 regarding the integration and success of Royall were false and misleading and omitted to disclose material facts because (1) the integration was not going "very well" but had serious problems; (2) Defendants omitted to disclose that as a private company, Royall could take longer to close its books than as a subsidiary of Advisory Board and that with its books open longer, Royall had been able to recognize revenue in prior years that it otherwise could not recognize once it became a part of Advisory Board; and (3) as a result of the integration problems associated with the acquisition, Defendants had no basis to increase the revenue guidance for Royall.

32.     On March 4, 2015, Advisory Board filed an Annual Report on Form 10-K for the transition period April 1, 2014 to December 31, 2014.  The Form 10-K discussed the Royall acquisition and stated, "Our acquisition of Royall significantly enhances our market leadership in

higher education and allows us to better serve our members through a variety of new offerings across the student lifecycle."

33.     The statement in Paragraph 32 regarding the acquisition of Royall was false and misleading and omitted to disclose material facts because it omitted to disclose that the integration of Royall had serious problems.

34.     On May 5, 2015, the Company issued a press release announcing financial results for the quarter ended March 31, 2015.  The Company reaffirmed its financial guidance for adjusted revenue for calendar year 2015 to be in the range of $780 million to $800 million.

35.     That same day, Defendants held a conference call with investors during which Defendant Musslewhite stated, with regard to the Royall integration, "***The good news here is that integration is moving more quickly than we had planned***, *and we are having some key early wins around introducing Royall's world-class enrollment managed services to education Advisory Board members that have an acute need for enrollment services*."

36.     Also on the conference call, Defendant Kirshbaum had the following exchange with an analyst:

> Donald Hooker- KeyBanc Capital Markets- Analyst
>
>> Okay.  I think in the previous quarter you mentioned that there might be some temporary margin pressures on Royall.  I'm just trying to think about Royall's margins are obviously already very high and impressive.  How, now that you're a little bit further along, obviously past the integration of Royall, how does that look for the rest of this calendar year and into 2016?
>
> Michael    Kirshbaum - Advisory Board Company - CFO
>
>> I think initially we said the first year there was obviously not a great deal of cost synergy.  ***Royall is a high-margin business.  I***

> ***don't think we expect it to be anything other than that. We
> expect it to maybe be able to maintain its margins***. But a lot of the
> synergies through revenue synergies would come in out years as we
> work together to pursue joint sales efforts, to penetrate cross-sell on
> both sides and develop new products off the platform.   That was
> our expectation.  ***We are pretty early, but those are proceeding as
> we would expect.***

37.      The bolded and italicized statements in Paragraphs 35 and 36 regarding the

integration and success of Royall were false and misleading and omitted to disclose material

facts because (1) the integration had serious problems; (2) Defendants omitted to disclose that, as

a private company, Royall could take longer to close its books than as a subsidiary of Advisory

Board and that with its books open longer, Royall had been able to recognize revenue in prior

years that it otherwise could not recognize once it became a part of Advisory Board; and (3)

Defendants omitted to disclose that Royall's CEO and CFO had already left Advisory Board.

38.      On August 4, 2015, the Company issued a press release announcing its financial

results for the quarter ended June 30, 2015.  In the press release the Company revised its prior

financial guidance for adjusted revenue, guiding that for calendar year 2015 the range would be

$780 million to $790 million, down from the prior guidance of $780 million to $800 million.

39.      That same day, Defendants held an earnings call with investors.  During the call,

for the first time, Defendants partially disclosed problems with Royall and its integration into

Advisory Board, including the unanticipated departure of Royall's CEO and CFO during the

previous quarter.  During the call, Defendant Musslewhite stated, in pertinent part, as follows:

> ***The only exception to an otherwise strong start to the year is
> Royall, where we were disappointed to see slower growth out of
> the gates than we expected***. Fortunately, given the acceleration of
> the rest of our business, we remain on track to deliver strong
> overall performance as a company this year, and set ourselves up
> for very good results in 2016 and beyond.  And we feel very good

about the path forward with Royall closely integrated into EAB and much more closely linked to our sales, renewals, and new product development teams and processes.

* * *

However, as I mentioned earlier, from a growth perspective Royall has not yet performed as we expected. There are three main reasons for the slow start.

*First, the CEO and CFO chose to depart earlier than expected, impacting sales and up-sells during a critical time and distracting the organization. Second, it is now clear that the time and attention the Royall team spent on the transaction and all the surrounding activity took focus away from key commercial activities, putting them too far behind to catch up in the June quarter. Third, Royall as a private company closed its books each quarter later than we do as a public company. We have moved Royall to our closed schedule and this timing change has some impact on when we were able to begin recognizing revenue for certain contracts, especially for the June quarter.*

*As a result of these issues, Royall revenue growth is pacing behind what we expected for the calendar year. In our judgment these are all one-time issues and very addressable, and while they are disappointing we do not expect them to persist.* We now have allocated significant Advisory Board talent to work with the Royall team to improve execution, and we're already seeing substantial improvements. Overall, the integration plan is proceeding ahead of pace.

40.     During the August 4, 2015 conference call, Defendant Kirshbaum also discussed the Company's problems with Royall, stating, in pertinent part, as follows:

Before discussing guidance for the year, I wanted to follow up on Robert's comments on Royall & Company and discuss the changes from our original expectations. *For the first six months of the year, Royall performance suffered for three main reasons. Deal distraction, which took time away from business-generating activities, management turnover which created a loss of focus and disrupted certain sales pursuits, and some lost timing in the transition from private to public company close calendar.*

13

\* \* \*

*This year the disruption caused by management turnover and deal distraction resulted in not capturing as many new clients or up-sell opportunities as the prior years.  And therefore the revenue from these sources in the January through June period was lower than expected.*

\* \* \*

*We are also impacted by a timing issue as Royall's transition from a private to public company.  As a private company, Royall could take longer to close their books than what we require of them to meet our public filing deadlines*

*With the books open longer, they had more time to get contracts back in from clients before closing their quarters, and by changing in close earlier there is some revenue that gets pushed into future quarters.*  This is strictly a timing issue and it will cycle through within a year.  We believe each of these incidents is isolated and solvable and we're making very good progress in putting the right people and processes in place to reflect performance going forward.

41.     Despite these problems, during the call, Defendant Musslewhite said that the Company needed "to continue to execute on the integration plan."  Further, when asked when exactly Royall's CEO and CFO left Advisory Board, Defendant Musslewhite responded, "During the second quarter.  Probably the middle of the second quarter, early on in the second quarter, *April, early May*."

42.     When asked about the impact of the departure of Royall's CEO and CFO, Musslewhite explained:

> It's- *number one, those guys were the ones that had their hands very tightly controlled around if there was any sales management, it was through those guys in terms of sitting on top of the business and steering the bus, as you will.  The CEO was also personally involved in a lot of the up-sell and cross-sell type conversations and had some relationships.  So it just disrupts.*

14

43.     Following this partial disclosure of the truth, Advisory Board's common stock fell 21%, from $59.36 per share on August 4, 2015 to close at $46.99 per share the next day, on unusually high volume of approximately 2.5 million shares.

44.     On November 5, 2015, the Company issued a press release announcing its financial results for the quarter ended September 30, 2015.  In the press release, the Company reaffirmed the financial guidance for adjusted revenue for calendar year 2015, which it announced on August 4, 2015, to be in the range of $780 million to $790 million.

45.     That same day, Defendants held an earnings call with investors.  During the call, Defendant Musslewhite continued to speak positively about the Company's integration efforts despite the problems it was experiencing with Royall, stating, in relevant part:

> *The good news is that from an integration and operational standpoint, we are making good progress here.*
>
> * * *
>
> Last but not least, we are heavily focused on the organizational integration efforts.  I have been tremendously impressed with the quality and dedication of the Royall team and their engagement and excitement about the linkage with EAB is palpable.  *When I look at the degree of interaction between multiple, different functional teams and the amount of collaboration across commercial, delivery, technology and central functions like finance, HR and IT, it feels very much like Royall is just as much a part of the Company as any other division.*
>
> It is a huge testament to the Royall leadership team and all the hard work on both sides that relationships and organizational collaboration feel good at this point and my hope is that this strong operational alignment will lead to good Royall results across 2016.  *Overall we remain both on track to deliver our expectations for the year* and optimistic about the long-term potential about the combination of Royall and the Advisory Board.

15

46.     The bolded and italicized statements in Paragraphs 45 were false and misleading and omitted to disclose material facts because (1) severe problems surrounding the integration continued to exist; and (2) the amount of goodwill that Advisory Board allocated to Royall was artificially inflated.

47.     On February 23, 2016, after the market closed, Advisory Board acknowledged the true state of affairs with Royall.   On that date, the Company issued a press release announcing a net loss of $101.8 million for the quarter ended December 31, 2015.   According to the press release, the increase in net loss was primarily attributable to an impairment charge of $95.7 million in the quarter ending December 31, 2015.

48.     That same day, Defendants held an earnings call with investors.   During the call, Defendant Kirshbaum disclosed that the $95.7 million impairment to goodwill was related to Royall.   Defendant Kirshbaum also revealed that Royall ended 2015 with only 5% revenue growth – significantly lower than the double-digit growth Defendants had previously guided. Kirshbaum further disclosed that the Company only expected Royall to grow in the mid-single digits going forward.   Indeed, according to Defendant Kirshbaum, Royall produced only $118 million in revenue in 2015, compared to Defendants' guidance of $125 million to $130 million.

49.     In response to this news, the price of Advisory Board common stock plummeted approximately 27%, from $36.29 per share on February 23, 2016 to close at $26.50 per share the next day, on extremely high volume of 8.5 million shares.

B.    **Post Class Period Developments**

50.    On March 11, 2016, Advisory Board filed its annual report for the fiscal year ended December 31, 2015 on Form 10-K.   Concerning the Company's goodwill impairment charge for Royall, the Form 10-K stated, in pertinent part, as follows:

> *In connection with our annual goodwill assessment on October 1, 2015, management reduced its cash flow projections for Royall due in part to first year performance being below the expectations we had set as of the acquisition date.*   Based on the results of the impairment test, we recorded an impairment charge of 15.3% of Royall's goodwill.   For information about this $99.1 million impairment charge, see Note 8, "Goodwill and intangibles," to our consolidated financial statements included in this report.
>
> *  *  *
>
> The Royall reporting unit had goodwill of $643.3 million as of October 1, 2015.   The estimated fair value of the reporting unit did not exceed its carrying value and therefore, step two of the goodwill impairment was performed.   *The decrease in fair value of the reporting unit from the acquisition was due to reduced projected cash flow growth rates due in part to lower than expected first year performance and lower market derived multiples between the January 9, 2015 acquisition date and the October 1, 2015 goodwill impairment assessment date*.   As the Company completed its calendar year 2016 forecast in the three months ended December 31, 2015 it revised its outlook for the Royall business, reducing cash flow forecasts over the projection period.   The projections incorporated the effect of current market conditions, including revenue growth,   customer attrition, operating margins, capital expenditures, and working capital dynamics.   The market-based WACC used in the income approach for Royal was 11%.    The terminal growth rate used in the discounted cash flow model was 3.5%.
>
> As the Royall reporting unit failed the step one test, the Company performed the step two test.   In connection with the step two test, the Company estimated the fair value of identifiable intangible assets and deferred revenue using methodologies consistent with those used in the original Royall purchase price allocation.   Key

assumptions were updated to reflect the current outlook for the Royall business as well as market conditions. ***The result of the step two analysis resulted in a goodwill impairment of 99.1 million.***

## V.   ADDITIONAL SCIENTER ALLEGATIONS

51.   As alleged herein, Advisory Board and the Individual Defendants acted with scienter in that they knew that the public statements and documents issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding Advisory Board, their control over, and/or receipt and/or modification of Advisory Board's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Advisory Board, participated in the fraudulent scheme alleged herein.

52.   Defendant Kirshbaum's scienter is further demonstrated by the fact that he sold massive amounts of Advisory Board common stock during the Class Period and while in possession of adverse, non-public, material information about the Company.   Over the course of the Class Period, Defendant Kirshbaum sold more than 31,000 shares of Advisory Board common stock for over $1.7 million in proceeds.

53.   On March 2, 2015, Defendant Kirshbaum sold 15,059 shares of Advisory Board common stock for proceeds of $817,854.29.   At the time of this sale, Defendant Kirshbaum

knew, but Defendants had not disclosed to the public, that the Royall integration was suffering from severe problems.

54. On June 17, 2015, Defendant Kirshbaum sold 11,191 shares of Advisory Board common stock for proceeds of $582,603.46. At the time of this sale, Defendant Kirshbaum knew, but Defendants had not disclosed to the public, that the Royall integration was suffering from severe problems and that Royall's CEO and CFO had left Advisory Board.

55. On July 16, 2015, Defendant Kirshbaum sold 5,250 shares of Advisory Board common stock for proceeds of $304,185.00. At the time of this sale, Defendant Kirshbaum knew, but Defendants had not disclosed to the public, that the Royall integration was suffering from severe problems and that Royall's CEO and CFO had left Advisory Board.

## VI.   LOSS CAUSATION

56. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and/or maintained the price of Advisory Board common stock and operated as a fraud or deceit on Class Period purchasers of Advisory Board common stock by failing to disclose and misrepresenting the adverse facts detailed herein. As Defendants' prior misrepresentations and fraudulent conduct were disclosed through a series of partial corrective disclosures and became apparent to the market, the price of Advisory Board common stock declined significantly as the prior artificial inflation came out of the Company's common stock price.

57. As a result of their purchases of Advisory Board common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws.

58. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the integration of Royall.  When the truth about the Company was revealed to the market through two partial corrective disclosures, the price of Advisory Board common stock fell significantly.  This decline removed the inflation from the price of Advisory Board common stock, causing real economic loss to investors who had purchased Advisory Board common stock during the Class Period.

59. The economic loss, i.e., damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate and/or maintain the price of Advisory Board common stock and the subsequent significant decline in the value of Advisory Board common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VII.  APPLICABILITY OF PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET DOCTRINE

60. Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Advisory Board common stock was an efficient market for the following reasons, among others:

> a. Advisory Board common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient, electronic stock market;
>
> b. as a regulated issuer, Advisory Board filed periodic public reports with the SEC and the NASDAQ;
>
> c. Advisory Board regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services; and

d.      Advisory Board was followed by securities analysts employed by major brokerage firms, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

61.      In the alternative, Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are primarily predicated upon the omission of material facts that Defendants had a duty to disclose, namely, Advisory Board's integration of Royall was not going to plan and was plagued with severe problems, during the Class Period.

62.      As a result of the foregoing, the market for Advisory Board common stock promptly digested current information regarding Advisory Board from all publicly available sources and reflected such information in the prices of the common stock.   Under these circumstances, all purchasers of Advisory Board common stock during the Class Period suffered similar injury through their purchase of Advisory Board common stock at artificially inflated prices and a presumption of reliance applies.

## VIII.   NO SAFE HARBOR

63.      The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements plead in this Complaint.

64.      Either the statements complained of herein were not forward-looking statements, but rather were historical statements or statements of purportedly current facts and conditions at the time the statements were made, or to the extent there were any forward-looking statements,

Advisory Board's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

65.     Further, the statutory safe harbor does not apply to statements included in financial statements that purportedly were made in accordance with GAAP, such as Advisory Board's Forms 10-K and 10-Q issued throughout the Class Period.

66.     To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

67.     To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, Defendants are liable for those false or misleading statements because, at the time each such statement was made, the speaker knew the forward-looking statement was false or misleading and the forward-looking statement was authorized and/or approved by an executive officer of Advisory Board who knew that the forward-looking statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## IX.     CLASS ACTION ALLEGATIONS

68.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Advisory Board between January 21, 2015 and February 23, 2016, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants and their families; the officers and directors of the Company, at all relevant times; members of their immediate families; and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

69.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Advisory Board common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Advisory Board or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

70.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

71.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

72.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

> a.      whether the federal securities laws were violated by Defendants' acts as alleged herein;
>
> b.      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Advisory Board
>
> c.      whether the price of Advisory Board common stock was artificially inflated and/or maintained  during the Class Period; and
>
> d.      to what extent the members of the Class have sustained damages and the proper measure of damages.

73.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.      COUNTS

### COUNT I
### FOR VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10B-5 AGAINST ALL DEFENDANTS

74.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

75.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

76.     Defendants:

   a.   employed devices, schemes, and artifices to defraud;

   b.   made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and

   c.   engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

77.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Advisory Board common stock.  Lead Plaintiff and the Class would not have purchased Advisory Board common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

78.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Advisory Board common stock during the Class Period.

**COUNT II**
**FOR VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT**
**AGAINST THE INDIVIDUAL DEFENDANTS**

79.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

80.     The Individual Defendants acted as controlling persons of Advisory Board within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Advisory Board, and their ownership of Advisory Board stock, and their culpable participation, as alleged above, the Individual Defendants had the power and authority to cause Advisory Board to engage in the wrongful conduct complained of herein.

81.     By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XI.     PRAYER FOR RELIEF

82.     WHEREFORE, Plaintiff prays for judgment as follows:

    a.     declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

    b.     awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    c.     awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

    d.     such equitable/injunctive or other relief as deemed appropriate by the Court.

## XII.     JURY TRIAL DEMANDED

83.     Plaintiff demands a trial by jury.

26

September 22, 2017                     Respectfully submitted,


                                      */s/ Steven J. Toll*
                                      Steven J. Toll (DC Bar #225623)
                                      Daniel S. Sommers (DC Bar #416549)
                                      Julie Goldsmith Reiser (DC Bar #482415)
                                      Elizabeth A. Aniskevich (DC Bar # 994603)
                                      **COHEN MILSTEIN SELLERS & TOLL
                                      PLLC**
                                      1100 New York Avenue NW, Suite 500
                                      Washington, DC 20005
                                      Telephone: (202) 408-4600
                                      Facsimile: (202) 408-4699
                                      Email: stoll@cohenmilstein.com
                                      dsommers@cohenmilstein.com
                                      jreiser@cohenmilstein.com
                                      eaniskevich@cohenmilstein.com



                                      *Attorneys for Plymouth County Retirement
                                      Association*

## CERTIFICATE OF SERVICE

I hereby certify that on Insert Date, I electronically filed the foregoing document with the

Clerk of the Court using the ECF, who in turn sent notice to the following:

Dated:   September 22, 2017                    */s/ Steven J. Toll*
                                              Steven J. Toll