UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PLYMOUTH COUNTY RETIREMENT ASSOCIATION, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Civil Action No.: 1:17-cv-01940-RC<br><br>CLASS ACTION |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| ADVISORY BOARD COMPANY, ROBERT W. MUSSLEWHITE, AND MICHAEL T. KIRSHBAUM, | ) ) ) ) ) | |
| Defendants. | ) ) ) | DEMAND FOR JURY TRIAL |

AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiffs City of Atlanta Firefighters' Pension Fund and City of Atlanta Police Officers' Pension Fund ("Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of The Advisory Board Company's ("Advisory Board" or the "Company") press releases, Securities and Exchange Commission ("SEC") filings, analyst reports, media reports, other publicly disclosed reports and information about the defendants, and interviews with former employees ("FE") of the Company.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of the common stock of Advisory Board between January 21, 2015 and February 23, 2016, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Advisory Board is a provider of software and solutions to the higher education and healthcare industries.  On January 9, 2015, Advisory Board completed the acquisition of Royall & Company ("Royall"), which provides services to colleges and universities in connection with the various phases of student recruitment.  Advisory Board's acquisition of Royall was the largest acquisition in the Company's history.

3.      During the Class Period, Defendants repeatedly highlighted the success they had integrating Royall into the Company.  For example, during the Company's May 5, 2015 conference call, Defendants claimed that integration was "moving more quickly than we had planned," and that there was "nothing surprising to us" during the quarter as a result of the Royall acquisition.

4.      In reality, Defendants knew that meaningful efforts to integrate Royall had not yet begun.  As one FE described the so-called Royall integration, Royall and Advisory Board "***were basically like two separate companies***" for nearly the entirety of the Class Period.  Contrary to Defendants' public statements, until January 2016, there was no integration of Royall's customer relationship management software, information technology, or human resources department into Advisory Board.  Nor was there any data sharing between the companies, which affected the ability of both companies' sales teams to cross-sell to each other's customers.  To make matters worse, when Advisory Board did try to cross-sell to Royall's customers, Advisory Board's aggressive sales strategy turned off many Royall customers and led to falling customer retention rates.

5.      As detailed further herein, Defendants – who implicitly admitted to closely monitoring and evaluating the Royall integration throughout the Class Period – were intimately aware that the integration with Royall was not proceeding efficiently and was negatively impacting the Company's business.  Moreover, unbeknownst to investors at the time, Royall's CEO and CFO, who had stayed on after the acquisition to help smooth the integration, ***had already left the Company prior to the May 5 call*** – which was earlier than expected.  In other words, despite claiming on the May 5 call that there was "nothing surprising" as a result of the Royall acquisition, the Company later conceded that the early departure of Royall's CEO and CFO was, in fact, unexpected.

6.      The loss of Royall's top two executives by no later than Royall's critical second-quarter sales period, both of whom were heavily involved in customer relations and sales, adversely impacted sales for the entire year to come.  It was also impossible that Defendants did not know that Royall's CEO departed prior to the May 5 call, since his successor made his first public address to Royall's employees ***three weeks earlier***.

7.      As a result of Defendants' fraudulent scheme, the price of Advisory Board stock was artificially inflated throughout the Class Period.  By the end of the Class Period, Defendants could no longer conceal the lack of progress of the Royall integration and the resulting negative and material impact on the Company's finances.

8.      On August 4, 2015, Defendants disclosed that the unexpected departure of Royall's CEO and CFO, along with Advisory Board's inability to recognize revenue on certain Royall contracts due to the shorter time that Royall could keep its books open now that it was part of a public company, led to disappointing financial results from Royall.  As a result, the price of Advisory Board stock plunged 21% the next day.

9.      Nevertheless, Defendants continued to falsely claim during the Class Period that, "from an integration and operational standpoint, we are making good progress" concerning Royall.  In actuality, the Company was not making material progress integrating Royall into Advisory Board.

10.     Then, on February 23, 2016, Defendants finally disclosed the extent of the problems it experienced with Royall.  On that date, the Company announced a net loss of $101.8 million for the quarter ended December 31, 2015, compared to a net loss of $5.4 million for the quarter ended December 31, 2014.  The increase in net loss was primarily attributable to an impairment charge of $95.7 million (subsequently increased to $99.1 million) to Royall's goodwill, due to Royall's "first year performance being below the expectations we had set as of the acquisition date."  On this news, Advisory Board's stock price plummeted approximately 27% the next day.

11.     As discussed herein, the Individual Defendants were motivated to conceal the truth about the departure of Royall's CEO and CFO, and the true state of Royall's integration, in order to secure approval at the June 9, 2015 annual meeting of Advisory Board stockholders for their significantly higher compensation for calendar year 2014:  Musslewhite's total compensation for an

abbreviated transition period in 2014 was $9,307,499 – more than double his compensation during fiscal year 2014 of $4,332,516, while Kirshbaum's total compensation for the 2014 transition period was $1,979,513, significantly higher than his compensation during fiscal year 2014 of $1,272,396.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)], and SEC Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and §27 of the Exchange Act [15 U.S.C. §78aa].

14.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as the alleged misconduct was transacted in, and emanated in large part from, this District. During the Class Period, Advisory Board maintained its headquarters in this District.

15.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NASDAQ Global Select Market ("NASDAQ"), a national securities exchange.

## PARTIES

16.     Lead Plaintiff City of Atlanta Firefighters' Pension Fund, as set forth in its certification previously filed with the Court and incorporated herein by reference, purchased Advisory Board common stock during the Class Period at artificially inflated prices and was damaged thereby.

17.     Lead Plaintiff City of Atlanta Police Officers' Pension Fund, as set forth in its certification previously filed with the Court and incorporated herein by reference, purchased

Advisory Board common stock during the Class Period at artificially inflated prices and was damaged thereby.

18.     During the Class Period, Defendant Advisory Board was a publicly traded consulting company that provided performance-improvement software and solutions to the healthcare and education industries.  During the Class Period, the Company's stock was listed and traded on the NASDAQ under the ticker symbol "ABCO."  As of May 1, 2017, the Company had more than 40.5 million shares of common stock outstanding.  On August 29, 2017, the Company announced its entry into a definitive merger agreement and a definitive education purchase agreement to sell its health care business to UnitedHealth Group's Optum health-services segment, and its education business to Vista Equity Partners.  On November 17, 2017, these two acquisitions closed, and on November 27, 2017, the Company's shares were delisted from the NASDAQ.

19.     Defendant Robert W. Musslewhite ("Musslewhite") was, throughout the Class Period, Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Advisory Board.

20.     Defendant Michael T. Kirshbaum ("Kirshbaum") was, throughout the Class Period, Chief Financial Officer ("CFO") and Treasurer of Advisory Board.

21.     Musslewhite and Kirshbaum are sometimes referred to herein, collectively, as the "Individual Defendants."  The Individual Defendants, together with Advisory Board, are sometimes referred to herein, collectively, as "Defendants."

22.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets, and present and future business prospects *via* access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports

of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and *via* reports and other information provided to them in connection therewith.

23.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the Individual Defendants, by virtue of their high-level positions with the Company and/or control of the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.   Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

24.    As officers and controlling persons of a publicly held company whose shares were registered with the SEC pursuant to the Exchange Act, and were traded over the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful and accurate information.  The

Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

25.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their membership on the Company's Board of Directors and/or executive and managerial positions with the Company, each of the Individual Defendants had access to the adverse undisclosed information about Advisory Board's business prospects and financial condition and performance as particularized herein and knew, or recklessly disregarded, that these adverse facts rendered the positive representations made by or about the Company and its business issued or adopted by the Company materially false and misleading.

26.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

## CLASS ACTION ALLEGATIONS

27.     Plaintiffs bring this action as a class action on behalf of all persons who purchased Advisory Board common stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant

times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

28.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands, of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Advisory Board or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

29.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

30.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

31.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the Exchange Act;

(b)     whether statements made by Defendants to the investing public omitted and/or misrepresented material facts about the business and operations of Advisory Board;

(c)     whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(d)     whether the price of Advisory Board common stock was artificially inflated; and

(e)     to what extent the members of the Class have sustained damages and the proper measure of damages.

32.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

33.     During the Class Period, Advisory Board was a provider of software and solutions to the higher education and healthcare industries.  Advisory Board's higher education business was known as the Education Advisory Board ("EAB" or "Advisory Board/EAB").  The Company's higher education programs supported colleges and universities in enrollment management; academic programming and student learning; faculty recruitment and retention; student advising and success; alumni affairs and advancement; and college and university operations.  During the Class Period, the Company offered distinct membership programs across four areas, which included best-practices research and insight, performance technology software, consulting and management services, and data- and tech-enabled services.

34.     Specifically, the Company claimed to provide insight-driven performance improvement solutions to more than 4,500 organizations, including hospitals, health systems, pharmaceutical and biotechnology companies, health care insurers, medical device companies, colleges, universities, and other health care-focused organizations and educational institutions.

Members of each program typically are charged a fixed fee and have access to an integrated set of services that may include best practice research studies, executive education seminars, customized research briefs, cloud-based access to the program's content database, and performance technology software.

35.     On December 10, 2014, Advisory Board announced that it had signed a definitive agreement to acquire Royall, described as the higher-education leader in strategic, data-driven student engagement and enrollment management solutions, financial-aid optimization, and alumni fundraising.  Under the terms of the agreement, Advisory Board agreed to purchase Royall for $850 million, consisting of $750 million in cash and approximately $100 million in Advisory Board stock.

36.     According to the Company, Royall's services help non-profit colleges and universities achieve such critical institutional goals as strengthening national reputations, broadening student enrollment, improving overall academic profiles, and enhancing revenue.  Royall typically begins its work with a university by evaluating an institution's enrollment objectives and then develops a strategy for future enrollment periods to generate improved enrollment.  In the second phase of work with a university, Royall will delve deeper into the enrollment strategy and use its databases to identify specific student segments and develop communications to target those segments for enrollment.  Through various channels of communication in this phase, Royall will help institutions reach out to prospective students.  Royall also evaluates the impact of the current program and optimizes it for future years, leading to typical multi-year engagements with clients.

37.     The Company believed there was significant potential for cross-selling opportunities between the EAB and Royall customer bases.  Royall had 200 unique customers with annual revenue per customer of $400,000 (total revenue of $80 million), whereas EAB had 700 unique customers

with annual revenue per customer of $57,000 (total revenue of approximately $40 million). According to a J.P. Morgan analyst, this created a total cross-sell opportunity of $291.4 million.

38.     On January 9, 2015, Advisory Board completed the acquisition of Royall.  The final purchase price for the acquisition, before taking into account specified adjustments, was approximately $871 million, consisting of $750 million in cash and 2,428,364 shares of Advisory Board common stock, valued at approximately $121 million based on Advisory Board's closing stock price of $49.92 per share on January 9, 2015.  Advisory Board funded the cash portion of the purchase price and the costs and expenses related to the acquisition with cash on hand and the proceeds from its new $775 million senior secured credit facilities, consisting of a $725 million senior secured term loan facility and a $50 million undrawn revolving credit facility.  An entity called Royall Holdings, LLC ("Royall Holdings") survived the transaction and owned the Advisory Board common stock paid to Royall.  Advisory Board allocated more than 78% of the Royall purchase, or approximately $664 million, to goodwill.

39.     Advisory Board's acquisition of Royall was the largest acquisition in the Company's history.

**DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF CONDUCT**

40.     At the time the acquisition was first announced in December 2014, Advisory Board projected that Royall would produce between $121 million and $124 million in revenue, representing between 15% and 18% growth from 2014 levels.  After the deal closed and management provided official 2015 guidance, Defendants raised full-year 2015 revenue guidance for Royall to $125 million to $135 million on February 11, 2015.

**(a)**     **Defendants Failed to Disclose Adverse Information Regarding the Royall Acquisition**

41.     On or about January 20, 2015, Advisory Board filed a registration statement and prospectus with the SEC through which: (1) Advisory Board offered to sell 3,650,000 shares of its common stock on its own behalf; and (2) Royall Holdings offered to sell 1,050,000 shares of the Advisory Board common stock it acquired less than two weeks earlier.  The registration statement appended Royall's audited consolidated financial statements for the years ended June 30, 2014, 2013, and 2012, as well as the unaudited consolidated financial statements as of September 30, 2014.

42.     However, unbeknownst to investors, Defendants recklessly disregarded that Advisory Board's depiction of Royall's reported revenue for prior years was materially misleading when made because, as a private company, Royall could take longer to close its books than as a subsidiary of Advisory Board.  With its books open longer, Royall had been able to recognize revenue in prior years for late contracts that it otherwise could not recognize once it became a part of Advisory Board.  For example, if work started for a customer in May, but the contract was not finalized and signed until July, Advisory Board would not be able to recognize that revenue in June.  As a private company, however, Royall had previously included that contract and recognized revenue on it in June.

43.     Defendants also failed to disclose to investors that the CEO and CFO of Royall – who were heavily involved in customer relations and sales – unexpectedly left the Company in early 2015, and that their early departure would have a negative impact on Royall's sales.  Indeed, during a May 5, 2015 earnings conference call, Defendant Kirshbaum, the Company's CFO, said that there was "nothing surprising to us" during the quarter as a result of the Royall acquisition.  However, Kirshbaum failed to disclose that Royall's CEO, John Nester ("Nester") and CFO, Leslie Collins

("Collins"), both of whom had remained with Advisory Board after the acquisition to help facilitate the integration, had already – and unexpectedly – left Advisory Board *prior to that call*.

44.     Plaintiffs' allegations are supported by the knowledge of two former employees of the Company.  As detailed below, these former employees each served in positions at the Company during the Class Period that provided them with access to the information they are alleged to possess.

45.     FE 1 was an Account Coordinator at Royall from 2011 through early 2017.  In his[1] position, FE 1 directly interfaced with approximately 15 higher-education clients on a day-to-day basis.  He was first in line to hear from the clients regarding Royall's marketing campaigns, with which he was involved.  FE 1 recalled attending a meeting on April 15, 2015, where John Nester's successor, Chris Marett ("Marett"), addressed Royall employees *as President of Royall* for the first time.  FE 1 said the meeting was held at J. Sargeant Reynolds Community College in Richmond, Virginia, down the street from Royall's headquarters, because Royall needed a space large enough to accommodate all of Royall's 300 employees for Marett's address.  Thus, according to FE 1, Nester definitely left the Company before April 15, 2015.[2]

46.     According to FE 1, at the same time Nester left the Company, there was a "wave" of middle to higher managers who also left the Company, including Royall's Chief Technology Officer ("CTO") and its Director of Production Services.  He said that, in addition to Nester and Collins, a "half dozen or so" people who were "higher up Royall lifer types" left Royall around the same time Nester left.

---

[1]     All former employees are identified in the masculine to protect their identities.

[2]     Although FE 1 believed that Nester's title after Royall was acquired by Advisory Board was President, as opposed to CEO, he stated unequivocally that Marett succeeded Nester.  Thus, Marett assumed the highest leadership position at Royall after Nester left.

47.     Similarly, FE 2 said that Nester and Collins left the Company in March or April 2015. FE 2 was a Senior Data Developer at Royall from 2014 to April 2016 (at which point he left the Company), and held other data-related positions at Royall beginning in 2011.  FE 2 started out as a data warehouse developer, where he structured student data, organized it, and prepared it to be analyzed by the entire Company.  FE 2 noted that the database he worked on was the engine of Royall because it powered decision-making.  FE 2 then moved into a development role, where he built up services to keep the operational side of the business going.  He subsequently served as a Senior Data Developer back on the data warehouse side.  Beginning in approximately November 2015, FE 2 also played a role integrating Royall with EAB.  FE 2 did not consider it "advanced integration," but rather "basically delivering file extracts" from Royall to the Company, since the Company did not begin to truly integrate Royall until January 2016.

48.     FE 2 stated that the departure of Nester and Collins "definitely hindered the sales efforts" because they had close ties to all of Royall's customers and were always in close communication with them, and their abrupt departure created uncertainty among Royall's customers.

49.     In addition, Marett's own LinkedIn profile confirms that Nester departed the Company in or about April 2015.  According to his LinkedIn page, Marett served as President of EAB/Royall & Co. from April 2015 to November 2017.  *See* https://www.linkedin.com/in/marett/ (last visited Jan. 9, 2018).

50.     Moreover, Musslewhite himself all but confirmed that Nester and Collins had left the Company prior to the May 5, 2015 conference call.  During an earnings conference call on August 4, 2015, when asked when exactly Royall's CEO and CFO left Advisory Board, Musslewhite

responded, "During the second quarter.  Probably the middle of the second quarter, early on in the second quarter, **April, early May**."[3]

51.     On August 4, 2015, Defendants disclosed that the unexpected departure of Royall's CEO and CFO, along with Advisory Board's inability to recognize revenue on certain Royall contracts due to the shorter time that Royall could keep its books open now that it was part of a public company, led to disappointing financial results from Royall, causing the Company's stock price to plunge 21%.  Nevertheless, Defendants continued to falsely claim during the remainder of the Class Period that, "from an integration and operational standpoint, we are making good progress" concerning Royall.  In actuality, the Company had barely made **any** progress integrating Royall into Advisory Board.

**(b)     Advisory Board's Integration of Royall Was Virtually Non-Existent During the Class Period**

52.     Defendants repeatedly made positive statements to investors about the integration of Royall but failed to disclose that meaningful efforts to integrate Royall had not yet begun.  For example, on a February 11, 2015 conference call, Defendant Musslewhite, the Company's CEO and Chairman, made positive statements about the Royall integration, stating that "in terms of culture, fit and integration, everything is going very well."  During a May 5, 2015 earnings conference call, Defendant Musslewhite stated that integration was "moving more quickly than we had planned." However, according to FE 2, "there was no integration that first year.  Nothing, I mean, we didn't even talk to anyone" at Advisory Board.  Although there were "a few people" who started to want to analyze the student data towards the end of 2015,  FE 2 said that "initially, there was no integration" with teams, data, and sharing.  FE 2 stated that towards the end of 2015 and the beginning of 2016, integration of Royall into Advisory Board finally started to happen.  He stated that during January

---

[3]     All emphasis is added unless otherwise noted.

2016, "things really started picking up with e-mail and all of that," and the integration did not finalize until after he left the Company.  But until January 2016, Royall and Advisory Board/EAB "were basically like two separate companies," according to FE 2.

53.     Beginning in January 2016, FE 2 said, the Company brought down people from Advisory Board and started integrating them and began to integrate systems.  According to FE 2, "I would say pretty confidently that things didn't really pick up" concerning Royall's integration into the Company "until the 1st of the year in '16."  With respect to information technology ("IT") matters, it was only in January 2016 that "they started integrating networks, integrating e-mails." Indeed, until that point, Royall and Advisory Board "were still running on two separate e-mail servers and we [Royall] didn't have access to the same contacts as them [Advisory Board/EAB]." FE 2 said that he was still using a Royall e-mail address when he left the Company in April 2016. FE 2 stated he was "pretty close to the IT team, you know the people that manage the e-mail server, the networks and all of that.  And yeah, there was no major planning until the next year, until '16." He said "it really was like we were off doing our own thing" during 2015.

54.     Even human resources matters were not integrated until 2016.  For example, according to FE 2, Royall employees did not have the same health insurance as Advisory Board employees until 2016.  He added that Royall employees were using the legacy payroll system as well.

55.     The lack of data sharing between the Company and Royall exemplified the lack of meaningful integration during 2015.  According to FE 2, EAB and Royall managed two sets of student data, such that EAB had its pool of student data and Royall had its pool of student data, and the data sets were not integrated until 2016.  FE 2 said that the separate data sets prevented the sales teams from formulating a plan to pursue customers with whom they had no prior association.

According to FE 2, "if I had both sets of data, I can maybe come to a commonality across the data sets," allowing the sales team to pitch specific new services to specific customers.  But because the data sets were not integrated in 2015, "things like that couldn't be done.  No strategy, no analysis around the common customers and then the customers they didn't share."

56.     FE 2 stated that when the Company finally took Royall's student data, it had to create a cross-reference set that would be able to match the two sets together and then be able to uniquely identify that student across data sets.  FE 2 said that was another "huge road block" because it takes a large amount of time to get it right, "and they didn't start until almost a year after" the acquisition. FE 2 noted that the Company started taking data sooner than January 2016 but, "again, there was no true integration, there was no automation around it, it was just manual requests and stuff like that. So, they started building automation around it after that year," beginning in January 2016.

57.     The failure to take adequate steps to meaningfully integrate Royall during 2015 is further illustrated by the use of different Salesforce software by both companies.  FE 2 said that both Royall and Advisory Board/EAB used Salesforce software for their Customer Relationship Management platform.  Salesforce housed all of the companies' customer contacts and contracts. According to FE 2, Royall's Salesforce software had contract definitions; "you'd have a customer and a contract and every year you would have a new contract, new services that they signed up for, etc.  So, that was the major use" of Salesforce by Royall.  According to FE 2, Royall's Salesforce software was not integrated with the Company's until the end of 2015 or January 2016.  FE 2's knowledge about the timing of the Salesforce integration is based on his position in Royall's engineering department and his personal involvement in the software integration.  The integration of Salesforce impacted engineering, as Royall's engineers needed to make changes to the software;

according to FE 2, "when they started that switch, conversion, engineering knew about it because we had to react to that change."

58.     Attempting to explain the stunning lack of meaningful integration during 2015, FE 2 stated: "I don't know if there was a, what's the word, agreement that they [Advisory Board] decided they wouldn't come in early or what.  I don't know that.  I heard a rumor that that was the case – that part of the deal was they wouldn't come in until a year after.  I don't know how true that is.  But, it was definitely something that was you know, it was in the rumor mill."  FE 2 said that the rumor at Royall was that Advisory Board would be "basically hands off" of Royall for the first year after the acquisition, such that Advisory Board/EAB would be hands off with Royall from "a truly integrated company" in terms of "the e-mail, all the systems and everything like that."  FE 2 heard this rumor from a development manager at Royall who reported to the CTO; the development manager learned there was an agreement not to integrate Royall for a year from a "senior-level person" at Royall.

59.     FE 2 said that the rumor matched the reality of the situation because "nothing happened for a while and then it started to all happen very suddenly and quickly.  And then they started integrating systems, integrating e-mail, integrating Salesforce, all of that, networks."  FE 2 added: "I know it takes a while to plan for that kind of thing but, I didn't see any of it until twelve months later," post-acquisition.  FE 2 stated that the rumor "seemed to fit reality because a lot of us kept asking when are they going to start sending people to at least integrate with, from an engineering standpoint, development standpoint," such that the two companies could "collaborate knowledge transfer and all of that.  So this was one of the major reasons why we anticipated" there was an agreement to not integrate Royall – "there was no communication from the parent company."

60.     Indeed, Musslewhite made a veiled reference to the existence of this rumored "hands off" agreement during the Company's May 5, 2015 conference call.  During the call, he said: "[W]e

always had a longer integration timeline planned when we acquired [Royall], with the company running a little bit more independently initially."

<blockquote>

(c)     **Advisory Board's Attempts to Cross-Sell to Royall Customers Were Thwarted by Advisory Board's Aggressiveness, and Resulted in Disappointing Retention Rates**

</blockquote>

61.     FE 1 stated that Advisory Board/EAB and Royall had different sales models due to the difference in their products.  He said that Advisory Board generally used a more aggressive sales approach, and when Advisory Board's sales team tried to use their aggressive sales strategy with Royall's clients shortly after the acquisition, this strategy adversely impacted the renewal of a significant number of contracts.

62.     According to FE 1, most of Advisory Board/EAB's products were subscription-based, such that if a university customer paid to attend relevant seminars, it could attend a couple of meetings or be a member for however long it wants, and it would just pay a monthly fee.  Advisory Board's sales model was, by nature, shorter term, allowing a customer to use the product while it made sense and making it easy to come and go.  On the other hand, Royall had at least one-year contracts with its customers that were based on hundreds of thousands of dollars' worth of business carried out over a full year.  To illustrate the difference between the nature of Royall's and Advisory Board/EAB's customer relationships, Royall had 200 unique customers with annual revenue per customer of $400,000, while EAB had 700 unique customers with annual revenue per customer of $57,000.

63.     According to FE 1, Royall's customer relationships were "a little more strategic in nature where we're trying to affect the outcome of an enrollment class" at a university.  However, FE 1 said, Advisory "tried to push some of their subscription-based stuff on a lot of our customers and it teed off some of our customers."

- 19 -

64.     According to FE 1, the biggest struggles Advisory Board faced in integrating Royall were Advisory Board's attempt to push this more aggressive sales strategy and its attempt to integrate the two client bases.  "Basically, what I understand Advisory did is when Royall and them kind of decided, yes, we're together now at last, Advisory Board started basically saying, o.k. Royall, give us your client list, we're going to sell all of our products to those people.  And I think a lot of the Royall clients were pushed back by that, just because our sales approach was more consultantary."[4]  FE 1 said that Royall had always been "about listening, what are you trying to accomplish.  This is how we can help you get there versus here's a bunch of products that we can sell you.  Some might help you, some of them might not.  There's actually a much more consultantary type of approach of selling that actually made sense for the client."  FE 1 stated: "I do think a lot of folks were kind of pushed away by the fact that they were being sold a lot of other stuff from the EAB side that wasn't necessarily in their interests."

65.     FE 1 explained that a lot of Royall customers were "turned off" by Advisory Board's aggressive sales approach.  FE 1 stated: "I know I had a client, for instance, that Advisory Board was approaching about being on a specific panel and the panel honestly made perfect sense for them to be on.  It would have been really helpful for them, but the way that they kind of proposed it and tried to sell it just turned them off."  The Advisory Board salesperson "basically said if you sign up by the end of the week, we can get you X at 10% discount or something like that.  It just made them feel like it was all about the now, now, now versus the strategic element of being part of this group."

66.     According to FE 1, Advisory Board's aggressive sales strategy had a significant negative impact on the renewal of numerous Royall clients' contracts.  FE 1 said that during the summer  2015 cycle, when Royall was trying to renew business in June 2015, Royall experienced

---

[4]     Plaintiffs believe FE 1 meant to use the word "consultatory."

declining retention numbers.  He stated: "I know for a fact that that year [2015] was the weakest retention year that we had at Royall in the whole time I was there."  According to FE 1, Royall's retention rate dropped from 95-97% to below 90%.  Indeed, FE 1 said that Royall's retention rates had dipped below 90% for the first time in his six-year tenure at Royall.  FE 1 knew Royall's retention rates because those figures were shared with him at meetings.  And although FE 1 directly interfaced with only 15 Royall clients on a daily basis, he said that he, as well as all of Royall's client-services group, was privy to how all of Royall's clients were tracking, not just his own clients.  FE 1 said that he attended bi-weekly meetings with all the account coordinators and associate strategic leaders where such information was discussed, and he would also receive weekly e-mails about where Royall was tracking with its clients.

67.     When asked whether people in senior management of Advisory Board and Royall were aware of the problems with aggressive attempts at cross-selling and declining retention rates, FE 1 responded: "I think that it was pretty obvious.  We had to have been aware of it by the end of June 30, because we were talking actively about not hitting goals and things like that, and retention not looking as good.  We track those numbers pretty aggressively.  I mean, I was the group that was retaining business, so, we were tracking that, you know, we were seeing weekly reports,  and who had this kind of client is retaining, these clients are a risk and all that, so, we had a pretty good idea that it wasn't looking as good as it had."  When asked who received these weekly reports, he said: "All I can confirm is that I know I did and my group did which consisted of all the account coordinators, associate strategic leaders, and strategic leaders.  Since we were all the client-facing group, we were actively tracking and trying to meet goals of retention, so those goals were shared with us, and cleared with us."  Concerning who would have received the information depicting

Royall's poor retention rates in 2015, FE 1 said: "if people on my level were seeing it, I imagine everybody above us saw them too."

68.     FE 2 was aware that, because the Company promised investors significant sales growth, the sales team felt pressure soon after the acquisition to quickly grow sales and customers. Ultimately, he said, they "failed miserably" at hitting those targets.  He added that he learned, in conversations with strategic analysts who worked with the sales team, that there was competition among sales people from Royall and Advisory Board/EAB, such that they were "playing against each other."  He said: "I would imagine you would have a single sales team that caters to all the customers and there is no competition amongst sales people.  Even if they are different services, it didn't make much sense to me how they were operating."

69.     On February 23, 2016, Advisory Board finally disclosed the extent of the problems with Royall.  On that date, the Company announced a net loss of ***$101.8 million*** for the quarter ended December 31, 2015, compared to a net loss of $5.4 million for the quarter ended December 31, 2014.  According to the Company, the increase in net loss was primarily attributable to an impairment charge of $95.7 million (subsequently increased to $99.1 million) to Royall's goodwill, due to Royall's "first year performance being below the expectations we had set as of the acquisition date."  In response, the Company's stock price plummeted 27%.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS MADE BY DEFENDANTS DURING THE CLASS PERIOD

70.     On January 20, 2015, after the market closed, Advisory Board filed with the SEC a shelf registration statement on Form S-3ASR (File No. 333-201608).

71.     On the same day, Advisory Board filed a preliminary prospectus supplement to the registration statement, pursuant to which Advisory Board offered 3,275,000 shares of its common stock and Royall offered 1,425,000 shares of Advisory Board common stock.

72.     On or about January 21, 2015, Advisory Board filed with the SEC a final prospectus supplement to the prospectus filed on January 20, 2015.   Pursuant to the final prospectus supplement, Advisory Board offered 3,650,000 shares of its common stock, Royall offered 1,050,000 shares of Advisory Board common stock, and the underwriters of the offering were granted an option to purchase up to an additional 705,000 shares of common stock from Royall Holdings.  On January 21, 2015, the last reported sale price of Advisory Board's common stock was $44.33 per share.  The Registration Statement stated that Advisory Board preliminarily allocated approximately $659 million of the Royall transaction to goodwill.

73.     The registration statement and prospectus supplements (collectively, the "Registration Statement") reported Royall's Consolidated Statements of Comprehensive Income for the years ended June 30, 2012, 2013, and 2014, stating, in pertinent part, as follows:

**Royall Acquisition Co. and Subsidiaries**
**Consolidated Statements of Comprehensive Income**
**Years Ended June 30, 2012, 2013 and 2014**

| | Predecessor | Successor | | |
| --- | --- | --- | --- | --- |
| | **Period Ended December 22, 2011** | **Period Ended June 30, 2012** | **Year Ended June 30, 2013** | **Year Ended June 30, 2014** |
| Revenue | $   32,720,889 | $ 45,768,178 | $ 88,615,775 | $104,632,341 |
| Postage expenses | (3,128,382) | (3,418,611) | (6,831,872) | (8,090,529) |
| Printing, mailshop, data processing and other production expenses | (4,823,941) | (5,189,374) | (10,973,401) | (11,744,601) |
| Personnel and benefits expenses | (12,103,062) | (14,003,813) | (28,767,284) | (31,611,705) |
| Occupancy expenses | (588,725) | (639,669) | (1,531,713) | (1,755,535) |
| Depreciation and amortization expense | (2,014,348) | (3,476,702) | (6,943,079) | (7,339,171) |
| Travel and workshop expenses | (628,930) | (910,689) | (1,647,939) | (1,822,465) |
| Selling, general and administrative expenses | (1,129,146) | (1,702,729) | (4,610,394) | (4,023,356) |
| Operating income | 8,304,355 | 16,426,591 | 27,310,093 | 38,244,979 |

| Other expenses | | | | |
|---|---|---|---|---|
| Interest expense | (2,995,625) | (8,835,870) | (16,004,414) | (15,769,395) |
| Transaction expenses | (1,159,661) | (5,996,466) | — | — |
| Amortization of deferred financing costs | (330,382) | (604,706) | (1,267,973) | (5,351,157) |
| Other loss | (857) | (349) | (20,508) | (51,675) |
| Net income before income taxes | 3,817,830 | 989,200 | 10,017,198 | 17,072,752 |
| Income tax expense | (1,570,395) | (2,678,238) | (3,848,057) | (6,669,394) |
| Net income (loss) | $ 2,247,435 | $ (1,689,038) | $ 6,169,141 | $ 10,403,358 |
| Total comprehensive income (loss) | $ 2,247,435 | $ (1,689,038) | $ 6,169,141 | $ 10,403,358 |

74. The statements of Royall's revenue referenced above in ¶73 were materially false and misleading when made because by speaking about Royall's revenues, Defendants created a duty to disclose that these revenues had been historically recognized over a longer period of time than they would be as a subsidiary of Advisory Board.

75. The offering was successful for the Company and Royall Holdings. On January 21, 2015, 3,650,000 shares of Advisory Board common stock were sold to the public by the Company, and 1,755,000 shares of Advisory Board common stock were sold by Royall Holdings. The shares were sold at a price to the public of $43.00 per share, less an underwriting discount of $1.935 per share, for a net per share purchase price of $41.065. After deducting the underwriting discount and selling costs, the net proceeds received by the Company were approximately $148.8 million.

76. On February 11, 2015, Advisory Board issued a press release announcing its financial results for the quarter and nine-month period ended December 31, 2014.[5] The Company provided updated revenue guidance for calendar year 2015 of $780 million to $800 million, equating to

---

[5]   On November 6, 2014, Advisory Board announced a change to its financial reporting periods to make its fiscal year consistent with the calendar year. Historically, the Company's fiscal year-end had been March 31. With this announcement, the Company changed its fiscal year to December 31 beginning with the-then current transition period ending December 31, 2014.

approximately $125 million to $135 million of Royall revenue.  The Company had previously announced revenue guidance for Royall of $121 million to $124 million in December 2014.

77.     On the same day, Defendants conducted a conference call with investors and analysts during which they made positive statements about the Royall acquisition and Royall's integration into the Company.  During the call, Defendant Musslewhite stated, in pertinent part, as follows:

> *Finally, in terms of culture, fit and integration, everything is going very well*. John Nester, Royal & Company's CEO, has been great to work with and his team is strong. Obviously, we're only a few weeks in here, but *there is a lot of positive momentum on both sides* and *we are confident that this combination is going to yield great success*.

78.     During the February 11, 2015 conference call, Defendant Kirshbaum noted the amount of due diligence the Company spent prior to acquiring Royall, stating: "In general, []Royall is a very high-margin business.  We spent a lot of time diligencing [*sic*] that to understand the sources of their margin power and how sustainable they were."

79.     The statements referenced above in ¶¶76-77 were each materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that Defendants knew or recklessly disregarded at the time the statements were made:

(a)     that as a private company, Royall could take longer to close its books than as a subsidiary of Advisory Board.  With its books open longer, Royall had been able to recognize revenue in prior years that it otherwise could not recognize once it became a subsidiary of Advisory Board;

(b)     that meaningful efforts to integrate Royall had not yet begun and, to the extent that there had been an effort to cross-sell EAB's services to Royall customers, those efforts had generally been unsuccessful; and

(c)       that as a result of the shorter time that Royall could keep its books open now that it was part of a public company, and the failure to take adequate steps to meaningfully integrate Royall, Defendants lacked a reasonable basis to increase the revenue guidance for Royall.

80.       On May 5, 2015, the Company issued a press release announcing its financial results for the quarter ended March 31, 2015.  In the press release, the Company reaffirmed its financial guidance for adjusted revenue for calendar year 2015 to be in a range of $780 million to $800 million.

81.       On the same day, Defendants conducted a conference call with investors and analysts during which they made positive statements about the Royall acquisition and Royall's integration into the Company.  During the call, Defendant Musslewhite stated, in pertinent part, as follows:

> Royall & Company is obviously more recent than the other two [acquisitions], since the [Royall] acquisition only closed in January, and we always had a longer integration timeline planned when we acquired them, with the company running a little bit more independently initially.  ***The good news here is that integration is moving more quickly than we had planned***, and we are having some key early wins around introducing Royall's world-class enrollment managed services to education advisory board members that have an acute need for enrollment services*.*

> We expect to have more news as the year progresses, but ***early signs lead us to feel good about our future prospects for not only continued cross-selling of Royall solutions to EAB members and EAB programs to Royall members***, but also key feature focused activity, such as joint new product development to provide more and more value to the industry around the student success lifecycle and deepen our relationships across our joint member base of the early 1,000 institutions.

82.       During the conference call, Defendant Kirshbaum had the following exchange with an analyst regarding Royall:

**Donald Hooker** - KeyBanc Capital Markets - Analyst

Okay. I think in the previous quarter you mentioned that there might be some temporary margin pressures on Royall. I'm just trying to think about Royall's margins are obviously already very high and impressive. How, now that you're a little bit further along, obviously past the integration of Royall, how does that look for the rest of this calendar year and into 2016?

**Michael Kirschbaum** - Advisory Board Company - CFO

I think initially we said the first year there was obviously not a great deal of cost synergy.  ***Royall is a high-margin business.  I don't think we expect it to be anything other than that.  We expect it to maybe be able to maintain its margins***.  But a lot of the synergies through revenue synergies would come in out years as ***we work together to pursue joint sales efforts, to penetrate cross-sell on both sides*** and develop new products off the platform.  That was our expectation. ***We are pretty early, but those are proceeding as we would expect***.

83.     Also during the May 5, 2015, conference call, Kirshbaum was asked whether there was anything that surprised him during the previous quarter in terms of his internal expectations, especially in light of the large amount of change at the Company following the Royall acquisition. Kirshbaum responded that there was "nothing surprising to us."  Kirshbaum had the following exchange with an analyst:

**Richard Close** - Avondale Partners - Analyst

You guys missed the consensus revenue and EBITDA estimates. ***Obviously, there was a lot of change in the quarter with Royall being acquired.  Was there anything that surprised you, yourself, I guess, in the quarter in terms of how you compared to your internal expectations?***

**Michael Kirschbaum** - Advisory Board Company - CFO

***I think we feel pretty good about pacing for the year, so nothing surprising to us***.  I think people may not realize that Royall did not close on January 1, so there are 10 days or so of Royall revenue and EBITDA that we did miss, it's a couple million dollars of revenue and $1 million plus of EBITDA.  I'm not sure how much – how that was baked into expectations. ***For us, we feel like we are definitely within the zone of pacing and feel pretty confident in our numbers for the year***.

84.     Discussing the Company's decreased appetite for additional acquisitions, Musslewhite stated: "***There is so much excitement that we have around Royall*** and so much upside from a lot of the things we've talked about on this call that I think that's really going to occupy our growth efforts around the higher ed side."

85.     The statements referenced above in ¶¶80-84 were each materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that Defendants knew or recklessly disregarded at the time the statements were made:

(a)     that as a private company, Royall could take longer to close its books than as a subsidiary of Advisory Board.  With its books open longer, Royall had been able to recognize revenue in prior years that it otherwise could not recognize once it became a part of Advisory Board;

(b)     that meaningful efforts to integrate Royall had not yet begun and, to the extent that there had been an effort to cross-sell EAB's services to Royall customers, those efforts had generally been unsuccessful;

(c)     that the CEO and CFO of Royall – who were heavily involved in customer relations and sales – had unexpectedly left Advisory Board prior to this time; and

(d)     that as a result of the shorter time that Royall could keep its books open now that it was part of a public company, the failure to take adequate steps to meaningfully integrate Royall, and the sudden departure of the CEO and CFO of Royall, Defendants lacked a reasonable basis to reaffirm the revenue guidance for Royall.

86.     Moreover, the statement that there was "nothing surprising to us" with regard to the Royall acquisition was materially false and misleading because the departure of the CEO and CFO of Royall, which took place prior to this statement, had been unexpected.

87.     On August 4, 2015, after the market closed, the Company issued a press release announcing its financial results for the quarter ended June 30, 2015.  In the press release, the Company updated its financial guidance for adjusted revenue for calendar year 2015 to be in a range of $780 million to $790 million, revised from the previous range of $780 million to $800 million.

88.     On the same day, Defendants conducted a conference call with investors and analysts. During the call, for the first time, Defendants partially disclosed problems with Royall and its integration into Advisory Board, including the unanticipated departure of Royall's CEO and CFO during the second quarter of 2015.  During the call, Defendant Musslewhite stated, in pertinent part, as follows:

> ***The only exception to an otherwise strong start to the year is Royall, where we were disappointed to see slower growth out of the gates than we expected***.  Fortunately, given the acceleration of the rest of our business, we remain on track to deliver strong overall performance as a company this year, and set ourselves up for very good results in 2016 and beyond.  ***And we feel very good about the path forward with Royall closely integrated into EAB and much more closely linked to our sales, renewals, and new product development teams and processes***.
>
> *       *       *
>
> However, as I mentioned earlier, from a growth perspective Royall has not yet performed as we expected.  There are three main reasons for the slow start.
>
> ***First, the CEO and CFO chose to depart earlier than expected, impacting sales and up-sells during a critical time and distracting the organization.  Second, it is now clear that the time and attention the Royall team spent on the transaction and all the surrounding activity took focus away from key commercial activities, putting them too far behind to catch up in the June quarter.  Third, Royall as a private company closed its books each quarter later than we do as a public company.  We have moved Royall to our closed schedule and this timing change has some impact on when we were able to begin recognizing revenue for certain contracts, especially for the June quarter***.
>
> ***As a result of these issues, Royall revenue growth is pacing behind what we expected for the calendar year***.  In our judgment these are all one-time issues and very addressable, and while they are disappointing we do not expect them to persist. We now have allocated significant Advisory Board talent to work with the Royall team to improve execution, and we're already seeing substantial improvements. Overall, the integration plan is proceeding ahead of pace.

89.     During the August 4, 2015 conference call, Defendant Kirshbaum also discussed the Company's problems with Royall, stating, in pertinent part, as follows:

> Before discussing guidance for the year, I wanted to follow up on Robert's [Musslewhite] comments on Royall & Company and discuss the changes from our original expectations.  ***For the first six months of the year, Royall performance***

*suffered for three main reasons. Deal distraction, which took time away from business-generating activities, management turnover which created a loss of focus and disrupted certain sales pursuits, and some lost timing in the transition from private to public company close calendar.* In this period, Royall typically generates a lot of new business both from bringing on new schools that are behind on enrollment, and in addition, expanding work with existing schools who are looking to add students late in the cycle.

*Historically, the January through June period is very busy for Royall as they help schools fill their classes before the May 1 deposit deadline.* In this period, Royall typically generates a lot of new business both from bringing on new schools that are behind on enrollment, and in addition, expanding work with existing schools who are looking to add students late in the cycle.

*This year the disruption caused by management turnover and deal distraction resulted in not capturing as many new clients or up-sell opportunities as the prior years. And therefore the revenue from these sources in the January through June period was lower than expected.*

*Not only does missing on the new sales impact the January through June revenue, but in a renewal business this impact extends for the next 12 months as well. With fewer new clients and less client expansion to renew, accrual revenue coming from renewals in the second half of the year will be below expectations.*

*We were also impacted by a timing issue as Royall's transition from a private to public company. As a private company, Royall could take longer to close their books than what we require of them to meet our public filing deadlines.*

*With books open longer, they had more time to get contracts back in from clients before closing their quarters, and by changing in close earlier there is some revenue that gets pushed into future quarters.* This is strictly a timing issue and it will cycle through within a year. We believe each of these incidents is isolated and solvable, and we're making very good progress in putting the right people and processes in place to reflect performance going forward.

90.     During the conference call, when asked when exactly did Royall's CEO and CFO leave Advisory Board, Musslewhite responded, "During the second quarter.  Probably the middle of the second quarter, early on in the second quarter, *April, early May*."

91.     During the same conference call, Musslewhite also discussed the impact on the Company of the departure of Royall's CEO and CFO.  An analyst and Musslewhite had the following exchange:

**Joseph Foresi** - Janney Montgomery Scott - Analyst

[A]nd so using that same methodology, Royall seems to have a compelling ROI. ***Why would the defection of the CEO or CFO or any of the distractions that you mentioned*** -- I guess I can understand closing of the books -- why would that ***affect the subscription rate if the product was incredibly compelling?***

**Robert Musselwhite** - Advisory Board Company - CEO

It's -- ***number one, those guys were the ones that had their hands very tightly controlled around if there was any sales management, it was through those guys in terms of sitting on top of the business and steering the bus, as you will. The CEO was also personally involved in a lot of the up-sell and cross-sell type conversations and had some relationships. So it just disrupts. When you are going towards a specific deadline of June 30 and for us the deadline is tighter because we close our books sooner than they typically did, and you have disruptions during that period, especially remember what Michael [Kirshbaum] said, the deposit date of May 1 and forward is a really critical time for them to come back and demonstrate that value.***

And you have a disruption to the process they followed, it just creates some looser execution than you want. It's not as if we don't have talented people in place and a great value proposition. We feel great about all that. It's just one of the reasons why we feel like this is one-time and very addressable.

92.    The departure of Royall's CEO and CFO in April 2015 had an outsize impact on Royall's sales because, as Musslewhite noted during the August 4 call, it occurred during Royall's critical sales season. A KeyBanc analyst observed that Royall's peak sales activity occurs from February to June as universities fill classes before the May deposit deadline. Also, Royall often picks up incremental business in the second quarter from universities that are behind their enrollment targets and are looking to add students late in the enrollment cycle.

93.    Similarly, analysts from William Blair explained why the departure of Nester and Collins affected Royall's sales so significantly, writing, in pertinent part, as follows:

Moreover, ***as these executives were involved in certain sales processes*** (which we do not view as unusual at a smaller, private organization), ***their loss affected the close rate during the important June quarter. Again, this is key for the outlook at Royall as the bulk of new sales happen during the first half of each calendar year; stated differently, as Royall is primarily focused on working with institutions to drive enrollment, it typically does not see as much new business activity after the***

*new academic year has started*.  Accordingly, we believe Advisory Board would been better off if the former Royall leadership simply stayed on board an extra few months or even if they left earlier in the year, thus allowing time for an orderly transition and a more hands-on integration strategy from the start.

94.     Barclays analysts attributed the drop in Royall sales to both the departure of Nester and Collins, and to Royall's move to the Company's more stringent quarter-end close process, writing, in pertinent part, as follows:

**Executive departures at Royall disrupted the key June Q selling season**. The unanticipated departure of Royall's CEO and CFO weighed heavily on the critical June Q sales period, altering Royall's 12-month revenue growth trajectory. The segment was also negatively affected by the move to ABCO's more stringent Q-end close process.

95.     In response to an analyst's question during the August 4 call, Kirshbaum provided further details concerning the revenue-recognition problem caused by the timing of Royall's book-closing.  Kirshbaum stated, in pertinent part, as follows:

[I]t really has to do with how the timing it takes to close their books, so we have to close within – get their books closed within 10 days to start tabulating our results to get them to [Ernst & Young], et cetera so we can report by today. *When they were a private company they could keep their books open for several more weeks and what that allowed them to do was catch any late contracts that came in*. *So somebody might have started doing work in May and it just took them a while to get the contract ready and the contract might have come in on July 20.  And so for us, we're not going to recognize revenue within the June period, but for them they would be able to catch the contracts they hadn't closed yet and they would recognize that revenue in June*.

Now we'll get a catch-up on that.  It's just timings in the year but it pushed it outside the quarter.  *And for the first half of the year it's north of a $2 million impact of contracts that are outstanding for work that's already been started*, the contracts are virtually done and agreed to, they just haven't made it through the provost's signature or the president's signature.  And that's the impact and it's just the difference between how fast we close their books and cut off those dates versus what they did previously.

96.     In response to this news, Advisory Board's common stock fell 21%, from $59.36 per share on August 4, 2015, to close at $46.99 per share the next day, on unusually high volume of approximately 2.5 million shares traded.

97.     Analysts from William Blair noted, in a September 9, 2015 report, that the sell-off of Advisory Board shares following the August 4 disclosure was due to problems with Royall, "as investors seemed to largely ignore the strength in the core healthcare and focus instead on the Royall sales weakness." And according to analysts at Craig-Hallum, "most of the Royall weakness was due to executives leaving during the peak selling season (Jan. – June)[.]"

98.     The William Blair analysts also reported that the loss of the Royall CEO and CFO in the middle of the second quarter "was a major surprise and disappointment to the Advisory Board management team." They wrote, in pertinent part: "In our follow-up conversations with management, it indicated that the Royall leadership team negotiated aggressively for long-term earn-out agreements and seemed committed to the organization, *so its retirement from Royall was quite shocking*."

99.     According to analysts from AvondalePartners, other Royall "key staff" left the Company in 2Q15, in addition to Royall's CEO and CFO.

100.    Despite the integration problems that Defendants acknowledged, however, the true facts about the Company remained concealed. For example, during the August 4, 2015 conference call, Musslewhite falsely stated that "we feel very good about the path forward, *with Royall closely integrated into EAB* and much more closely linked to our sales, renewals, and new product development teams and processes." Musslewhite also misleadingly stated: "Overall, the integration plan is proceeding ahead of pace."

101.    In addition, during the call, Musslewhite misleadingly said that the Company needed "to continue to execute on the integration plan," stating, in pertinent part, as follows:

> As always, our depth of relationships and insight in healthcare and higher education gives us a tremendous advantage at understanding opportunities to serve members in new ways. And we continue to actively pursue new ideas that fit within our overall business formula. Whether through organic new launches or acquisitions, we

continue to see exciting new areas for future growth and expansion that we will pursue.

And in this regard Royall is really important because it's a critical platform for future growth in our vision of how we can impact the industry. ***Therefore we need to continue to execute on the integration plan***. This will improve operations which will flow through to financial results, and more importantly, advance the innovative ways we can link Royall to our other assets and help transform higher education.

102.     During the same conference call, Musslewhite discussed the results of the Company's efforts to cross-sell its EAB services to Royall clients.   An analyst and Musslewhite had the following exchange:

**Sean Wieland** - Piper Jaffray & Co. - Analyst

All right. ***And you had mentioned in the past beginning to focus on driving cross-selling in Q3 with Royall.  How does the changes that happen affect that strategy and what do you think about your plans there beginning in Q3?***

**Robert Musselwhite** - Advisory Board Company - CEO

For all the integration plan levers, this has accelerated it. ***So I would say on all sales-related activity we are in there and already yielding results***. There have been a couple of cross-sells already that came through EAB relationships.  The sales process management's in place, the sort of positioning and going to market. ***So the cross-sell of Royall into Advisory Board members is already – we are moving quickly there***.  I think you'd see the same thing back into the Royall membership across the next six months, so if anything it's probably on a faster schedule than we might have anticipated at the beginning of the year.

103.     The statements referenced above in ¶¶87-88 and 100-102 were each materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that Defendants knew or recklessly disregarded at the time the statements were made:

(a)       that meaningful efforts to integrate Royall had not yet begun and, to the extent that there had been an effort to cross-sell EAB's services to Royall customers, those efforts had generally been unsuccessful; and

(b)     that Defendants lacked a reasonable basis for the Company's updated financial guidance for adjusted revenue for calendar year 2015 to the extent it incorporated revenue guidance for Royall.

104.     On September 27, 2015, analysts from Canaccord Genuity reported on a conversation they had with Musslewhite, during which he described favorably the progress that the Company was having with the Royall integration.  The analysts wrote, in pertinent part, as follows:

> We recently spent time with ABCO CEO Robert Musslewhite prior to his presentation to Leadership Health Care in Nashville, TN.  Our takeaways from our conversation are: 1) while the Royall 2Q FY'15 disappointment will impact revenue through June '16, **the company has moved forward with integration and progress is materializing**[.]

105.     The statement referenced above in ¶104 was materially false and misleading when made, with knowing or reckless disregard for the truth, because it failed to disclose that meaningful efforts to integrate Royall had not yet begun and, to the extent that there had been an effort to cross-sell EAB's services to Royall customers, those efforts had generally been unsuccessful.

106.     On November 5, 2015, the Company issued a press release announcing its financial results for the quarter ended September 30, 2015.  In the press release, the Company reaffirmed the financial guidance for adjusted revenue for calendar year 2015, which it announced on August 4, 2015, to be in a range of $780 million to $790 million.

107.     On the same day, Defendants conducted a conference call with investors and analysts. During the call, Defendant Musslewhite continued to positively describe the Company's integration efforts despite the problems it had been experiencing with Royall, stating, in pertinent part, as follows:

> **The good news is that from an integration and operational standpoint, we are making good progress there**.

*        *        *

Last but not least, ***we are heavily focused on the organizational integration efforts***. I have been tremendously impressed with the quality and dedication of the Royall team and their engagement and excitement about the linkage with EAB is palpable. ***When I look at the degree of interaction between multiple, different functional teams and the amount of collaboration across commercial, delivery, technology and central functions like finance, HR and IT, it feels very much like Royall is just as much a part of the Company as any other division***.

It is a huge testament to the Royall leadership team and all the hard work on both sides that relationships and organizational collaboration feel good at this point and my hope is that this strong operational alignment will lead to good Royall results across 2016. ***Overall, we remain both on track to deliver our expectations for the year*** and optimistic about the long-term potential about the combination of Royall and The Advisory Board.

108.    The statements referenced above in ¶¶106-107 were each materially false and misleading when made because they failed to disclose and misrepresented the following adverse facts that Defendants knew or recklessly disregarded at the time the statements were made:

(a)    that meaningful efforts to integrate Royall had not yet begun and, to the extent that there had been an effort to cross-sell EAB's services to Royall customers, those efforts had generally been unsuccessful;

(b)    that there had not yet been sufficient, if any, collaboration across finance, HR and IT functions such that it would credibly feel like Royall was as much a part of the Company as any other division of Advisory Board;

(c)    that Defendants lacked a reasonable basis to re-affirm the Company's financial guidance for adjusted revenue for calendar year 2015 to the extent it incorporated revenue guidance for Royall; and

(d)    that, as of October 1, 2015, the estimated fair value of the Royall reporting unit did not exceed its carrying value and, therefore, Royall had failed step one of the goodwill impairment test, which was due to reduced projected cash flow growth rates caused, in part, by lower than expected first-year performance at Royall.

109.    On November 11, 2015, an AvondalePartners analyst wrote that "[t]he Royall acquisition in higher education experienced lower renewal rates after its post-deal disruption," and that "[m]ost renewals for Royall . . . fell after the March 31 date for which the Advisory Board tabulates annual statistics.  Royall had a significantly lower renewal rate and fewer-than-expected new wins in its spring selling season."

110.    On February 23, 2016, after the market closed, Advisory Board finally acknowledged larger problems concerning Royall than previously disclosed.  On that date, the Company issued a press release announcing a ***net loss of $101.8 million*** for the quarter ended December 31, 2015, compared to a net loss of $5.4 million for the quarter ended December 31, 2014.  According to the press release, the increase in net loss was primarily attributable to an impairment charge of $95.7 million in the quarter ending December 31, 2015.

111.    On the same day, Defendants conducted a conference call with investors and analysts. During the call, Kirshbaum disclosed that ***the $95.7 million impairment to goodwill was related to Royall***, and noted that it was preliminary and could change slightly before the Company filed its Form 10-K.

112.    During the same call, Kirshbaum stated that, for 2015, ***Royall ended with only 5% revenue growth***, which was significantly lower than the double-digit growth Defendants had previously guided, which was no lower than 15% and as high as 21%.  Kirshbaum also said that the Company only expected Royall to grow in the mid-single digits going forward.  Indeed, according to Kirshbaum, Royall produced only $118 million in revenue in 2015, compared to Defendants' guidance of $125 million to $135 million.

113.    In addition, Musslewhite acknowledged that Advisory Board was facing "a ton of complexity and change," which prevented the Company from making additional acquisitions. Musslewhite had the following exchange with an analyst during the conference call:

**Shlomo Rosenbaum** - Stifel Nicolaus - Analyst

Hey, Robert, I want to ask you with the reorg that's going on, the focus on Royall, the efforts that you're making in terms of re-engaging in certain areas or focus on sales.  I'm just trying to reconcile that with the ability to make acquisitions this year and whether it's just going to stretch the Company just too much, I mean, what are your thoughts on that?

**Robert Musslewhite** - The Advisory Board Company - CEO

Well, I actually think, I sort of think about it in the reverse, although your question on a global basis is right.  *Can we do another acquisition and dump it into a place where there's a ton of complexity and change right now?  No, of course not*.

*           *           *

There are certain places in the business where would I wouldn't want to make an acquisition today, just given some of the complexity, but the types of acquisitions we're looking at, I actually think we're very well set up to manage those effectively.

114.    Analysts reacted negatively to the news disclosed on February 23, 2016.   For example, in a report to investors the next day, an analyst from Cantor Fitzgerald wrote, in pertinent part, as follows:

*The core business is no longer able to absorb slower than originally anticipated growth from the Royall acquisition. We are lowering our price target to $32 from $60*.

*           *           *

Advisory Board posted somewhat light results in 4Q:15, as *the integration of Royall is still a work in progress* and the demand front for healthcare faces uncertainties. . . . *The integration of Royall has not progressed as originally planned, and it may take some time before we see further synergies*.

*           *           *

**Royall Integration and Healthcare Demand Weigh on Results**. 4Q:15 adjusted revenue was $205.0, growth of 37.5% y/y, vs. our estimate of 40.3%, *with shortfall coming from muted growth at Royall* and lower-than-expected conversion rates in

the Healthcare business.   In Healthcare, the revenue cycle business was most impacted by softer demand as the passing of the October 1st ICD-10 deadline led to a halt in sales of products related to preparation for the implementation of the regulation. ***Originally, management had expected full-year contribution from Royall to be $125-130 million, but overall impact came in at $118 million***. We estimate organic growth was 8% y/y in the quarter.

*       *       *

**Royall Experiencing Growing Pains**

**Royall Pains**

**Royall Performance**.   In January 2015, ABCO acquired Royall & Company ("Royall"), a provider of strategic, data-driven student engagement and enrollment management solutions for higher education institutions.   ABCO purchased Royall for $850 million, consisting of $750 million in cash and $100 million in ABCO stock. The Royall purchase price was just above 8x Royall's FY:14 revenues, 18x FY:14 EBITDA, and 65x FY:14 earnings.   ABCO currently trades at 2.3x revenues and 20x earnings.

In FY:13, Royall grew revenues by 13% and then by 18% in FY:14.   From FY:11 to FY:14 Royall revenues grew by a [compound annual growth rate ("CAGR")] of 14.5%, which is in line with ABCO's historical growth rates.   ***However, in 2015, Royall only grew by 5%, to $118 million, below management's expectations of $125-130 million, due to a rocky integration, with the top two executives (CEO & CFO) from Royall resigning.   We believe it will take some time for revenue growth rates to ramp back up and normalize***.

In the years 2010 to 2014, ABCO made many smaller to medium-size acquisitions in order to build out the business. In these years, cash purchases for acquisitions averaged 1.05x adjusted net income.   However, this was not a drain on cash as cash flows from operations well outpaced net income due to the large amount of deferred revenues received each year.   ***Until the Royall purchase, ABCO had not had to issue any new debt or common stock to fund acquisitions***.

Unlike prior acquisitions, ABCO issued $575 million in new debt and almost $150 million in new common stock to finance the Purchase of Royall.   The interest expense for 2015 was around $20 million and the stock issuance led to share dilution of around 10%.   ***Goodwill grew by $664 million from $187 million to $851 million with the purchase, meaning that over 78% of the purchase of Royall was allocated to goodwill on the balance sheet.   In 4Q:15, ABCO had to write down $95 million of this Goodwill for impairment, leading to reported GAAP EPS of -$2.43***. Goodwill is now 37% of assets and 164% of total equity.

115.   Michael Boyd, writing on Seeking Alpha on August 26, 2016, wrote, in pertinent part, as follows:

**Poorly Executed Acquisition, Resulting Impairment Charge**

In what amounts to a rather ***stunning apparent misstep***, Advisory Board ended up booking a $99M impairment charge related to its acquisition of Royall, a higher education data solutions provider.  This transaction closed early January of 2015 and failed its first goodwill impairment test in October of the same year.  ***It is highly unusual, even in transactions rich in booked goodwill, for a company to misstep so poorly in projecting first year cash flows to necessitate a failed impairment test year one***.

Advisory Board does not break out Royall results separately, but the company did reveal some specifics during the Q4 2015 call (alongside the impairment charge).  ***The fact that Royall only generated $118M in revenue is painful enough; paying 7x revenue on any business is steep.  That is beside the fact that the business is only growing mid-single digits***.  While Advisory Board has not provided any granular detail, back-of-the-envelope calculations put adjusted EBITDA of Royall at $45M at the time of acquisition (pro-forma fiscal 2014 was $143M, reported EBITDA of $97M in same time frame for Advisory Board).  Purchase price was therefore in the neighborhood of 18x EV/EBITDA.

***At the time of the acquisition announcement, Advisory Board management was trumpeting Royall's 15% CAGR in revenue/EBITDA since 2012.  How (and why) did the business contract to 5% growth nearly overnight in 2015?  This isn't a one-time annual miss; management expects more single-digit growth from the business in 2016.  The lack of a real answer here from management is about as big of a red flag as you can get***.

116.    Analysts noted that the weaker selling season that Royall suffered through as a result of John Nester's departure in April 2015 had continued to reverberate through the end of the Class Period.  On February 23, 2016, an analyst from William Blair wrote, in pertinent part, as follows:

First, although Royall continued to see solid improvement during the quarter, ***the weaker selling season in early 2015 will continue to hit the company's initial 2016 outlook (a roughly 200-basis-point hit to growth versus the initial plan), as the bulk of new sales will not occur until the spring and summer of 2016*** (thus management cannot assume stronger 2016 growth at this point in the year—rather it is taking a wait-and-see approach).

*        *        *

Still, as discussed above, ***the mid-2015 weakness will take a full year to lapse, so investors will now need to wait until the heavy May/June selling season to assess the future growth outlook*** (and bears will remain skeptical on the transaction despite management's commentary, in our view).

117.    Likewise, on February 25, 2016, a Deutsche Bank analyst noted the long-term effects of the weak sales in early 2015, writing, in pertinent part, as follows:

> *Mgmt stated on the call that the weakness in last year's key Royall selling season will take 2pts off total revenue growth in 2016*, while a weak 4Q selling season takes off 3pts.  Also, due to the weak 4Q, mgmt now expects the reacceleration of bookings to take a couple quarters, which takes another 1-2pts off reported 2016 organic rev growth.  Ex these items, mgmt is suggesting a more normal organic revenue growth rate of 10% to 13%.

118.    In response to the news disclosed on February 23, 2016, the price of Advisory Board common stock plummeted approximately 27%, from $36.29 per share on February 23, 2016, to close at $26.50 per share the next day, on extremely high volume of 8.4 million shares traded.

### POST-CLASS PERIOD DEVELOPMENTS

119.    On March 11, 2016, Advisory Board filed its annual report for the fiscal year ended December 31, 2015, on Form 10-K.  Concerning the Company's goodwill impairment charge for Royall, the Form 10-K stated, in pertinent part, as follows:

> *In connection with our annual goodwill assessment on October 1, 2015, management reduced its cash flow projections for Royall due in part to first year performance being below the expectations we had set as of the acquisition date*.  Based on the results of the impairment test, we recorded an impairment charge of 15.3% of Royall's goodwill.  For information about this $99.1 million impairment charge, see Note 8, "Goodwill and intangibles," to our consolidated financial statements included in this report.

> *        *        *

> The Royall reporting unit had goodwill of $648.3 million as of October 1, 2015.  The estimated fair value of the reporting unit did not exceed its carrying value and, therefore, step two of the goodwill impairment was performed.  *The decrease in fair value of the reporting unit from the acquisition was due to reduced projected cash flow growth rates due in part to lower than expected first year performance and lower market derived multiples between the January 9, 2015 acquisition date and the October 1, 2015 goodwill impairment assessment date*.  As the Company completed its calendar year 2016 forecast in the three months ended December 31, 2015, it revised its outlook for the Royall business, reducing cash flow forecasts over the projection period. The projections incorporated the effect of current market conditions, including revenue growth, customer attrition, operating margins, capital expenditures, and working capital dynamics. The market-based WACC used in the

- 41 -

income approach for Royall was 11%. The terminal growth rate used in the discounted cash flow model was 3.5%.

As the Royall reporting unit failed the step one test, the Company performed the step two test. In connection with the step two test, the Company estimated the fair value of identifiable intangible assets and deferred revenue using methodologies consistent with those used in the original Royall purchase price allocation. Key assumptions were updated to reflect the current outlook for the Royall business as well as market conditions. The result of the step two analysis resulted in a goodwill impairment of $99.1 million.

## ADDITIONAL SCIENTER ALLEGATIONS

120.    As alleged herein, Advisory Board and the Individual Defendants acted with scienter in that they knew that the public statements and documents issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Advisory Board, their control over, and/or receipt and/or modification of Advisory Board's allegedly materially misleading statements, and/or their associations with the Company that made them privy to confidential proprietary information concerning Advisory Board, participated in the fraudulent scheme alleged herein.

121.    In addition, Defendants' positive statements regarding the integration of Royall were lacking in a reasonable basis at all times because the integration of Royall had barely begun prior to December 2015/January 2016. Moreover, after the departure of Royall's CEO and CFO in April 2015, Defendants lacked a reasonable basis to make positive statements about the Company's Royall integration, especially because Defendants knew, by their own admissions (*see* ¶¶89,104), that the weaker selling season in 2Q15 – a direct result of John Nester's departure – would impact Royall's

revenue through June 2016.  Further, the departure of Royall's CEO and CFO was a red flag to Defendants that obligated them to investigate the status of Royall's integration.

122.    The fact that the Royall acquisition was the largest in Advisory Board's history also served as a red flag for Defendants to closely follow the status of Royall's integration.  Indeed, analysts at AvondalePartners noted on July 20, 2015, and periodically throughout the Class Period, that the size of the Royall acquisition "suggests a bigger integration challenge than the Advisory Board is used to dealing with."

123.    The Individual Defendants' scienter is further demonstrated by the fact that they were motivated to conceal the truth about the departure of Royall's CEO and CFO, and the true state of Royall's integration, in order to secure approval at the June 9, 2015 annual meeting of Advisory Board stockholders for their significantly higher compensation for calendar year 2014.  On April 28, 2015, the Company filed a Definitive Proxy Statement ("Proxy") with the SEC, which provided Advisory Board stockholders a "say on pay" vote to approve or vote against the compensation of the Company's named executive officers for 2014.[6]  According to the Proxy, Musslewhite's total compensation for the 2014 transition period,[7] which was subject to shareholder approval, was $9,307,499 – more than double his compensation during fiscal year 2014 of $4,332,516 and significantly higher than his fiscal year 2013 compensation of $3,839,839.  Kirshbaum's total compensation for the 2014 transition period, $1,979,513, was significantly higher than his compensation during fiscal year 2014 of $1,272,396, as well as his fiscal year 2013 compensation of $1,156,308.  According to the Proxy, although the Company's "say on pay" vote was advisory and,

---

[6]    The stockholder "say on pay" vote was retrospective.

[7]    As explained above, in November 2014, the Company changed its fiscal year end from March 31 to December 31.  Thus, the 2014 transition period was the nine-month period from April 1, 2014 through December 31, 2014.

therefore, not binding on the Company, to the extent that there was any significant vote against approval of the named executive officer compensation, the Company would "consider [its] stockholders' concerns and [would] evaluate whether any actions are necessary to address those concerns."  Accordingly, the Individual Defendants were motivated to portray the Royall integration in a positive light in order to safeguard their materially higher 2014 compensation from an adverse vote by stockholders in advance of the June 9, 2015 annual meeting of Advisory Board stockholders.

## LOSS CAUSATION/ECONOMIC LOSS

124.     During the Class Period, as detailed herein, Defendants made false and misleading statements and omissions, and engaged in a scheme to deceive the market, and a course of conduct that artificially inflated the price of Advisory Board common stock and operated as a fraud or deceit on purchasers of Advisory Board common stock during the Class Period by misrepresenting the Company's business and prospects.  As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Advisory Board common stock fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of Advisory Board common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

125.     Specifically, on August 4, 2015, after the market closed, Defendants partially disclosed problems with Royall and its integration into Advisory Board, including the unanticipated departure of Royall's CEO and CFO during the previous quarter, and the Company's inability to recognize certain revenue that Royall otherwise would have been able to recognize as a private company.  In response, the price of Advisory Board common stock fell 21%, from $59.36 per share on August 4, 2015, to close at $46.99 per share the following day, on unusually high volume of approximately 2.5 million shares traded.

126.   In addition, on February 23, 2016, after the market closed, Advisory Board acknowledged larger problems concerning Royall than previously disclosed.  On that date, the Company issued a press release announcing a net loss of $101.8 million for the quarter ended December 31, 2015, compared to a net loss of $5.4 million for the quarter ended December 31, 2014. According to the press release, the increase in net loss was primarily attributable to an impairment charge of $95.7 million in the quarter ending December 31, 2015, which was directly related to Royall.  On the same date, Defendants also disclosed that, for 2015, Royall ended with only 5% revenue growth, which was significantly lower than the double-digit growth Defendants had previously guided, which was no lower than 15% and as high as 21%.  Specifically, Royall produced only $118 million in revenue in 2015, compared to Defendants' guidance of $125 million to $135 million.  In response, the price of Advisory Board common stock fell approximately 27%, from $36.29 per share on February 23, 2016, to close at $26.50 per share the next day, on extremely high volume of 8.4 million shares traded.

127.   The declines in the price of Advisory Board common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Advisory Board common stock negate any inference that the losses suffered by Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Advisory Board common stock and the subsequent significant declines in the value of Advisory Board common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## NO SAFE HARBOR

128.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

129.     Plaintiffs are entitled to a presumption of reliance under the fraud-on-the-market doctrine because the market for Advisory Board's publicly traded stock was open, well-developed and efficient at all times during the Class Period.  As a result of the materially false and misleading statements alleged herein, Advisory Board common stock traded at artificially inflated prices during the Class Period.  Further, Plaintiffs and other members of the Class purchased Advisory Board common stock in reliance on the integrity of the market price of the common stock and the market information relating to Advisory Board, and were damaged thereby.

130.     At all relevant times, the market for Advisory Board common stock was an efficient market for the following reasons, among others:

> (a)     Advisory Board common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)      as a regulated issuer, Advisory Board filed periodic public reports with the SEC and the NASDAQ;

(c)      Advisory Board regularly communicated with public investors *via* established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)      Advisory Board was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

131.    As a result of the foregoing, the market for Advisory Board common stock promptly digested current information regarding Advisory Board from all publicly available sources and reflected such information in the price of the common stock.  Under these circumstances, all purchasers of Advisory Board common stock during the Class Period suffered similar injury through their purchase of Advisory Board common stock at artificially inflated prices and a presumption of reliance applies.

132.    Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon omissions of material fact for which there was a duty to disclose.  Specifically, Plaintiffs are entitled to a presumption of reliance throughout the Class Period because, as more fully alleged above, Defendants failed to disclose material information regarding the Company's operations, forecasts, and business prospects.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

133.    Plaintiffs incorporate ¶¶1-132 by reference.

134.    During the Class Period, Defendants carried out a plan that was intended to, and did: (a) deceive the investing public, including Plaintiffs and the Class; and (b) artificially inflate the price of Advisory Board common stock.

135.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)     engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Advisory Board common stock during the Class Period.

136.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Advisory Board common stock.  Plaintiffs and the Class would not have purchased Advisory Board common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

137.    Plaintiffs incorporate ¶¶1-136 by reference.

138.     During the Class Period, the Individual Defendants participated in the operation and management of Advisory Board, and conducted and participated, directly and indirectly, in the conduct of Advisory Board's business affairs.  Because of their senior positions, they knew the adverse non-public information about Advisory Board's false financial statements and materially weak internal controls.

139.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Advisory Board's financial condition and results of operations, and to correct promptly any public statements issued by Advisory Board that had become materially false or misleading.

140.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings that Advisory Board disseminated in the marketplace during the Class Period concerning Advisory Board's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Advisory Board to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Advisory Board within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of Advisory Board common stock.

141.     Each of the Individual Defendants, therefore, acted as a controlling person of Advisory Board.  By reason of their senior management positions and/or being directors of Advisory Board, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Advisory Board to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Advisory Board

and possessed the power to control the specific activities that comprise the primary violations about which Plaintiffs and the other members of the Class complain.

142.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Advisory Board.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Determining that this action is a proper class action, certifying Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  January 9, 2018              ROBBINS GELLER RUDMAN
                                                & DOWD LLP
                                          SAMUEL H. RUDMAN (admitted *pro hac vice*)
                                          DAVID A. ROSENFELD (admitted *pro hac vice*)
                                          MARIO ALBA JR.
                                          ALAN I. ELLMAN (admitted *pro hac vice*)

                                          */s/ David A. Rosenfeld*
                                          DAVID A. ROSENFELD

58 S. Service Road, Suite 200
Melville, NY 11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
malba@rgrdlaw.com
aellman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
NANCY M. JUDA (DC Bar # 445487)
1701 K Street NW, Suite 350
Washington DC 20036
Telephone:  202/822-6762
202/828-8528 (fax)
njuda@rgrdlaw.com

*Lead Counsel and Attorneys for Plaintiffs*

<u>CERTIFICATE OF SERVICE</u>

I, David A. Rosenfeld, hereby certify that on January 9, 2018, I authorized a true and correct copy of the Amended Class Action Complaint for Violations of the Federal Securities Laws to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ David A. Rosenfeld*

DAVID A. ROSENFELD