# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PLYMOUTH COUNTY RETIREMENT  :
ASSOCIATION, on Behalf  :
of Itself and All Others Similarly Situated,  :
             :
   Plaintiff,      :  Civil Action No.:  17-1940 (RC)
             :
   v.        :  Re Document No.:  18
             :
ADVISORY BOARD COMPANY, *et al.*,  :
             :
   Defendants.     :

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

## I. INTRODUCTION

The co-lead plaintiffs in this class action, the City of Atlanta Firefighters' Pension Fund and the City of Atlanta Police Officers' Pension Fund, assert that The Advisory Board Company, its Chief Executive Officer, Robert W. Musslewhite, and its Chief Financial Officer, Michael T. Kirshbaum, violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 by issuing a series of materially false and misleading public statements in 2015. Those statements concerned Advisory Board's acquisition of Royall & Company, and Royall's post-acquisition performance. According to Plaintiffs, Defendants publicly touted the Royall acquisition's success and Royall's 2015 performance, knowing that the acquisition and Royall's performance were unlikely to meet the market's expectations.

Defendants have asked this Court to dismiss Plaintiffs' complaint. Defendants argue that none of the challenged statements were materially false or misleading when made, even if the statements were wrong in hindsight. Defendants further argue that to the extent their statements

*were* materially false or misleading, Defendants did not possess the state of mind necessary to hold them liable.

Having combed through Plaintiffs' voluminous allegations and the relevant record submissions, the Court agrees that most of Defendants' statements were not false or misleading. Plaintiffs' challenge of these statements amounts to inactionable "fraud by hindsight." On the other hand, certain statements about Advisory Board's projected 2015 revenues were rendered misleading by Defendants' failure to tell investors that shortly before the statements were issued, key executives had left the company. For the reasons set forth in greater detail below, the Court thus grants Defendants' motion in part and denies it in part.

## II. FACTUAL BACKGROUND

### A. Advisory Board and Royall

During the Class Period, Advisory Board was a publicly traded consulting company "that provided performance-improvement software and solutions to the healthcare and education industries." Am. Compl. ("FAC") ¶ 18, ECF No. 16.[1] Advisory Board's profits were driven by its healthcare business. *Id.* ¶ 97 (referencing Advisory Board's "core" healthcare business); Jan. 21, 2015 Advisory Board Prospectus at S-1 (noting that Advisory Board served over 3,900 health care organizations and approximately 600 colleges and universities), Defs.' Mem. Supp. Mot. to Dismiss ("Defs.' Mem.") Ex. 4, ECF no. 18-5.[2] That said, Advisory Board's higher education

---

[1] In 2017, after the Class Period, Advisory Board ceased to be an independent public company. *See id.*

[2] This prospectus and the other Exhibits cited in this Memorandum Opinion are explicitly referenced in Plaintiffs' amended complaint. And "it is well-established that a court 'may consider the full text of the SEC filings, prospectus, analysts' reports and statements "integral to the complaint," even if not attached, without converting the motion into one for summary judgment under Fed. R. Civ. P. 56.'" *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 174 n.8 (D.D.C. 2007) (quoting *Bovee v. Coopers & Lybrand C.P.A.,* 272 F.3d 356, 360–61 (6th Cir. 2001)).

business was substantial: At the time of the Royall acquisition it had 700 unique clients with annual revenue of $57,000 per client. FAC ¶ 37. The business "supported colleges and universities in enrollment management; academic programming and student learning; faculty recruitment and retention; student advising and success; alumni affairs and advancement; and college and university operations." *Id.* ¶ 33.

Royall was a consulting company focused on higher education. *See id.* ¶ 36. Royall helped its college and university clients "strengthen[] [their] national reputations, broaden[] student enrollment, improv[e] overall academic profiles, and enhance[] revenue." *Id.* It typically executed multi-year engagements, in which it would optimize clients' enrollment programs over time. *See id.* When it was acquired, Royall had 200 unique clients with annual revenue of $400,000 per client. *Id.* ¶ 37. The nature of Royall's model—comprehensive, high-margin engagements with fewer clients—meant that client retention and development were vitally important on a year-to-year basis. *See id.* ¶¶ 64–66.

On January 9, 2015, Advisory Board finalized its acquisition of Royall for approximately $871 million; $750 million in cash and $121 million in Advisory Board stock. *Id.* ¶ 38. Of this purchase price, approximately $660 million was attributed to Royall's "goodwill."[3] *See id.* ¶¶ 38, 72. It was the largest acquisition in Advisory Board's history. *Id.* ¶ 39. When Advisory

---

[3] Goodwill is "[a] business's reputation, patronage, and other intangible assets that are considered when appraising the business, esp. for purchase; the ability to earn income in excess of the income that would be expected from the business viewed as a mere collection of assets." *Goodwill*, Black's Law Dictionary (10th ed. 2014); *see also Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555 (1993) (describing goodwill as a company's value "beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers . . . ." (quoting *Metro. Nat'l Bank of N.Y. v. St. Louis Dispatch Co.*, 149 U.S. 436, 446 (1893)).

Board announced the acquisition, it projected that Royall would produce $121 million to $124 million in revenue in 2015, on 15% to 18% growth from 2014 levels. *Id.* ¶ 40.

## B. The Class Period[4]

Based in part on information supplied by two confidential witnesses, Plaintiffs allege that from January 21, 2015 through February 23, 2016 (the "Class Period"), *id.* ¶ 1, Defendants made a series of false or misleading statements and omissions regarding Royall's performance and its integration into Advisory Board's business. The touchstone of these allegations is that Defendants knew of certain developments that would cause Royall to underperform its revenue projections and fail to properly integrate with Advisory Board, at least in the short-term. Plaintiffs claim that Defendants delayed revealing these developments to investors, which caused Advisory Board's stock prices to remain higher than they would have been if the market had full information. When the other shoe dropped and the market caught wind of Royall's problems, Advisory Board's stock price plunged. Before evaluating the merits of Plaintiffs' amended complaint, the Court will describe the relevant Class Period statements and events.

### 1. January 2015 Stock Offering

On January 20 and 21, 2015, Advisory Board filed a registration statement and two prospectuses with the SEC, through which Advisory Board offered to sell several million shares of stock. *Id.* ¶¶ 70–72. These materials appended Royall's financial statements for the years ended June 30, 2012, June 30, 2013, and June 30, 2014, and for the period between June 30, 2014 and September 30, 2014. *Id.* ¶¶ 41, 73. The financial statements reflected Royall's

---

[4] Plaintiffs' amended complaint emphasizes, in bold and italics, many of Defendants' statements that Plaintiffs claim are false or misleading. *See, e.g.*, *id.* ¶¶ 89, 95, 107. The Court's background summary omits these emphases for ease of reading.

revenue recognition practice described below, but Advisory Board's filing did not explain that practice to investors.  *Id.* ¶ 74.

## 2.  Fourth Quarter 2014

On February 11, 2015, Advisory Board issued a press release and held a conference call to discuss its financial results for the fourth quarter of 2014.  *Id.* ¶¶ 76–77.  In the press release, Advisory Board projected total 2015 revenues of $780 million to $800 million.  *Id.* ¶ 76. Advisory Board further projected that $125 million to $135 million of that revenue would come from Royall.  *Id.*  During the conference call, Mr. Musslewhite touted the scalability of Royall's business model, stating that "[i]n general . . . Royall is a very high-margin business. We spent a lot of time diligencing [sic] that to understand the sources of their margin power and how sustainable they were."  *Id.* ¶ 78; Feb. 11, 2015 Earnings Call Tr. at 23, Defs.' Mem. Ex. 6, ECF No. 18-7.  He also added, regarding the acquisition, that

> in terms of culture, fit and integration, everything is going very well. John Nester, Royal & Company's CEO, has been great to work with and his team is strong. Obviously, we're only a few weeks in here, but there is a lot of positive momentum on both sides and we are confident that this combination is going to yield great success.

FAC ¶ 77.  Mr. Kirshbaum echoed Mr. Musslewhite's comments, but noted that "the revenue synergies" and "cross-sell potential" of the Royall acquisition would not "have much impact in calendar '15."  Defs.' Mem. Ex. 6 at 23.

## 3.  Early Royall-Related Issues

Soon after Advisory Board acquired Royall, cracks allegedly began to form in what Defendants hoped would be a seamless integration of the two companies.  First, Royall's CEO and CFO unexpectedly left Advisory Board in or around April 2015.  FAC ¶¶ 45, 47, 49.  A former Royall Account Coordinator ("FE 1") corroborates this development, stating that he attended a meeting on April 15, 2015 during which the Royall CEO's successor addressed

Royall's employees for the first time.  *Id.* ¶ 45.  Plaintiffs claim that several other high-level

Royall employees, including the Chief Technology Officer, left around the same time.  *Id.* ¶¶ 46,

Second, at some point, Advisory Board discovered a discrepancy between how Royall

accounted for its revenue before the acquisition and how Advisory Board would account for

Royall's revenue after the acquisition.  As a private company, Royall regularly delayed closing

its books for a given quarter so that it could recognize revenue for contracts for which work was

performed that quarter, but were not signed or otherwise executed until the next quarter.  *See id.*

¶¶ 88, 95.[5]  Advisory Board, as a public company, could not delay closing its books in the same

manner.  *Id.* ¶¶ 88, 95.  After the acquisition, Advisory Board corrected this discrepancy by

recognizing $2 million of revenue in third quarter, 2015 that Royall would have recognized in

second quarter, 2015.  *Id.* ¶ 95.  In other words, the revenue recognition difference was a timing

issue that resulted in revenue shifting from one fiscal period to the next but, importantly, did not

impact the amount of revenue that Advisory Board could ultimately recognize from Royall's

work.  *See id.* ¶¶ 88, 95.

### 4.  First Quarter 2015

On May 5, 2015, Advisory Board issued a press release and held a conference call to

discuss its financial results for the first quarter of 2015.  In the press release, Advisory Board

reaffirmed its earlier projection that total 2015 revenues would be $780 million to $800 million.

---

[5] As Mr. Kirshbaum put it during the August 4, 2015 conference call:

[S]omebody might have started doing work in May and it just took them a while to get the contract ready and the contract might have come in on July 20. And so for us, we're not going to recognize revenue within the June period, but for them they would be able to catch the contracts they hadn't closed yet and they would recognize that revenue in June.

*Id.* ¶ 95.

*Id.* ¶ 80.  It did not alter its previous Royall revenue projection.  *See* May 5, 2015 8-K, Defs.'

Mem. Ex. 9 at 7, ECF No. 18-10.  During the conference call, Defendant Musslewhite stated, in

part, that:

> Royall & Company is obviously more recent than the other two [acquisitions], since the [Royall] acquisition only closed in January, and we always had a longer integration timeline planned when we acquired them, with the company running a little bit more independently initially. The good news here is that integration is moving more quickly than we had planned, and we are having some key early wins around introducing Royall's world-class enrollment managed services to education advisory board members that have an acute need for enrollment services.
>
> We expect to have more news as the year progresses, but early signs lead us to feel good about our future prospects for not only continued cross-selling of Royall solutions to EAB members and EAB programs to Royall members, but also key feature focused activity, such as joint new product development to provide more and more value to the industry around the student success lifecycle and deepen our relationships across our joint member base of the early [sic] 1,000 institutions.[6]

*Id.* ¶ 81 (first two alterations in original).  In response to an analyst's question regarding

"temporary margin pressures on Royall," Mr. Kirshbaum added:

> I think initially we said the first year there was obviously not a great deal of cost synergy. Royall is a high-margin business. I don't think we expect it to be anything other than that. We expect it to maybe be able to maintain its margins. But a lot of the synergies through revenue synergies would come in out years as we work together to pursue joint sales efforts, to penetrate cross-sell on both sides and develop new products off the platform. That was our expectation. We are pretty early, but those are proceeding as we would expect.

*Id.* ¶ 82.  Finally, when asked if anything surprised him regarding Advisory Board's internal

expectations for the first quarter compared to actual EBITDA and revenue numbers,[7] Mr.

Kirshbaum stated, in relevant part, that "I think we feel pretty good about pacing for the year, so

nothing surprising to us. . . . For us, we feel like we are definitely within the zone of pacing and

---

[6] "EAB" stands for Education Advisory Board, Advisory Board's higher education business unit.  *See id.* ¶ 33.

[7] EBITDA is a key financial metric: earnings before interest, taxes, depreciation, and amortization.  *See Earnings*, Black's Law Dictionary (10th ed. 2014).

feel pretty confident in our numbers for the year." *Id.* ¶ 83. Finally, Mr. Musslewhite

emphasized the "excitement that we have around Royall and so much upside . . . ." *Id.* ¶ 84.

### 5. Royall's Falling Client Retention Rates and Poor Cross-Selling

Advisory Board's acquisition of Royall was motivated, in part, by the opportunity for

Advisory Board to cross-sell Royall's clients on Advisory Board's products. *See id.* ¶ 37.

According to Plaintiffs, however, it became apparent by June 2015 that Advisory Board's cross-

selling attempts would be largely unsuccessful in 2015. *Id.* ¶¶ 61–68. FE 1 attributes this

struggle to Advisory Board's aggressive sales tactics, which "teed off" Royall's clients. *Id.* ¶¶

63–65. A second confidential witness ("FE 2"), a former Royall Senior Data Developer, *id.* ¶ 47,

proffered that Advisory Board "failed miserably" at hitting its sales targets, in part, because of

competition between Royall's sales team and Advisory Board's sales team. *Id.* ¶ 68.

Advisory Board's aggressive sales tactics, Plaintiffs claim, also negatively impacted

Royall's ability to renew its existing client contracts. *Id.* ¶ 66. As a result, according to FE 1,

Royall's client retention rate dropped from its historic level of 95–97% to below 90% in 2015.

*Id.* As a Royall Account Coordinator responsible for fifteen accounts, FE 1 participated in

meetings and received emails in which the declining renewal trend was discussed. *Id.* He stated

that the client account group was "aware of [the trend] by the end of June 30, [2015,] because we

were talking actively about not hitting goals and things like that, and retention not looking as

good." *Id.* ¶ 67. FE 1 could not unequivocally state that Advisory Board's upper management

received the same information that he did, but he posited that "if people on my level were seeing

it, I imagine everybody above us saw [the information] too." *Id.*

### 6. Second Quarter 2015

On August 4, 2015, Advisory Board issued a press release and held a conference call to discuss its financial results for the second quarter of 2015.  In the press release Advisory Board slightly reduced the top end of its 2015 revenue guidance, from $800 million to $790 million. *See id*. ¶ 87.  Advisory Board did not mention its Royall revenue guidance in the press release, *see* Aug. 4, 2015 8-K, Defs.' Mem. Ex. 12, ECF No. 18-13, but Mr. Kirshbaum clarified during the conference call that that the company reduced its top end projection "to account for the impact of Royall performance," Aug. 4, 2015 Earnings Call Tr. at 10, Defs.' Mem. Ex. 13, ECF No. 18-14.

During the conference call, Mr. Musslewhite for the first time discussed hiccups in the Royall integration.  FAC ¶ 88.  He stated that "[t]he only exception to an otherwise strong start to the year is Royall, where we were disappointed to see slower growth out of the gates than we expected." *Id*.  This slower-than-expected growth, according to Mr. Musslewhite and Mr. Kirshbaum, was attributable to three factors.  First, "the [Royall] CEO and CFO chose to depart earlier than expected, impacting sales and up-sells during a critical time and distracting the organization." *Id.*  Put simply, "management turnover." *Id*. ¶ 89.  Second, Royall's focus on the acquisition and transition "took focus away from key commercial activities." *Id*. ¶ 88.  Put simply, "[d]eal distraction." *Id*. ¶ 89.  Third, Advisory Board was required to recognize certain revenues in the third quarter that Royall would likely have recognized in the second quarter under its pre-acquisition practice. *Id*. ¶ 88.  Put simply, "lost timing." *Id*. ¶ 89.  Royall's lower-than-expected sales and renewals would cause their revenues to "be below the low end of" the company's initial projection "by several million dollars," on a single-digit growth rate.  Defs.' Mem. Ex. 13 at 12, 16.

Mr. Kirshbaum further clarified these hiccups. He noted that "the January through June period is very busy for Royall as they help schools fill their classes before the May 1 deposit deadline," leading to new business and up-selling opportunities for the company. FAC ¶ 89. The deal distraction and Royall departures "resulted in not capturing as many new clients or up-sell opportunities as the prior years." *Id.* Mr. Kirshbaum also noted that this impact—"fewer new clients and less client expansion to renew"—would reduce Royall's revenues for the following twelve months, into 2016. *Id.*

Mr. Musslewhite discussed Royall's management turnover in greater detail. He said that before the Royall departures, Advisory Board "had a dialogue with [Royall's management] around a 5-year term" with a "strong incentive plan" and an oral commitment. Defs.' Mem. Ex. 13 at 12. He also noted that Royall's CEO and CFO were heavily involved in the company's business. They "had their hands very tightly controlled around if there was any sales management, it was through those guys in terms of sitting on top of the business and steering the bus . . . ." FAC ¶ 91. Royall's "CEO was also personally involved in a lot of the up-sell and cross-sell type conversations and had some relationships." *Id.* Advisory Board was "surprised by" their departure, Defs.' Mem. Ex. 13 at 12, in "April, early May," FAC ¶ 90.

Despite Royall's underwhelming performance, Mr. Musslewhite put a positive spin on the Royall integration. He emphasized that Advisory Board "remain[s] on track to deliver strong overall performance as a company this year," and that "we feel very good about the path forward with Royall closely integrated into EAB and much more closely linked to our sales, renewals, and new product development teams and processes." FAC ¶ 88. He noted that the problems discussed on the call "are all one-time issues and very addressable." *Id.* "Overall," according to

Mr. Musslewhite, "the integration plan is proceeding ahead of pace." *Id.*; *see also id.* ¶ 101 ("Therefore we need to continue to execute on the integration plan.").

Not only was the Royall integration plan proceeding ahead of schedule, according to Mr. Musslewhite, but so was Advisory Board's plan to cross-sell Royall's customers. In response to a question regarding the company's cross-selling strategy, Mr. Musslewhite stated that "on all sales-related activity we are in there and already yielding results." *Id.* ¶ 102. He added further that Advisory Board sales teams were "working closely with the Royall sales teams in terms of relationship intelligence, in terms of teeing up cross-sell opportunities and in terms of actually managing pipelines . . . ." Defs.' Mem. Ex. 13 at 19. Noting that "[t]here've been a couple of cross-sells already," Mr. Musslewhite asserted that "if anything [the strategy] is probably on a faster schedule than we might have anticipated at the beginning of the year." *Id.* at 18.

In sum, Defendants acknowledged that multiple factors combined to cause Royall to underperform in the first half of 2015. During Royall's critical sales season, from January to June, Royall's employees were distracted by the Advisory Board acquisition and were less focused on acquiring new customers and up-selling existing customers. And Royall's CEO and CFO, who were typically heavily involved in Royall's sales, left the company just as the sales season ramped up. While Mr. Musslewhite and Mr. Kirshbaum acknowledged that these factors would likely cause Royall to underperform in the second half of 2015 and into 2016, they asserted that Royall's underperformance was a correctible, one-time event. They also asserted that the Royall integration was on track overall, and that Advisory Board's cross-selling strategy was ahead of schedule and bearing fruit.

Immediately after the August 4, 2015 press release and conference call, Advisory Board's stock price fell 21%, from $59.36 per share to $46.99 per share. FAC ¶ 96. Analysts attributed

this drop, at least in part, to the Royall hiccups discussed on the August 4 call, including the departure of Royall's CEO and CFO. *Id.* ¶¶ 92–94, 97–99. As one market analyst put it, "investors seemed to largely ignore the strength in the [company's] core healthcare [practice] and focus instead on the Royall sales weakness." *Id.* ¶ 97.

### 7. Third Quarter 2015

On November 5, 2015, Advisory Board issued a press release and held a conference call to discuss its financial results for the third quarter of 2015. In the press release Advisory Board reaffirmed the 2015 revenue guidance issued in August: $780 million to $790 million. *Id.* ¶ 106. During the conference call, Mr. Musslewhite doubled down on the positivity he expressed in August regarding the Royall integration: "When I look at the degree of interaction between multiple, different functional teams and the amount of collaboration across commercial, delivery, technology and central functions like finance, HR and IT, it feels very much like Royall is just as much a part of the Company as any other division." *Id.* ¶ 107. Because Advisory Board was "heavily focused on the organization integration efforts," the company "remain[ed] both on track to deliver [its] expectations for the year and optimistic about the long-term potential about the combination of Royall and The Advisory Board." *Id.*

### 8. Delayed Integration

Plaintiffs allege that Advisory Board did not begin integrating Royall in earnest until late 2015 or early 2016, despite Defendants' positive statements through 2015 to the contrary. *See id.* ¶ 52. For instance, FE 2 stated that Advisory Board and Royall employees were still using separate email systems with separate contacts in early 2016. *See id.* ¶ 53. More importantly, according to FE 2, the two companies maintained separate sets of student data through the end of 2015, such that their sales teams could not easily compare the two client rosters. *See id.* ¶ 55.

Instead, Advisory Board's sales team was forced to manually request data from Royall's team, and vice versa. *See id.* ¶ 56. And through the end of 2015, the two companies used separate Salesforce software to manage their client relationships. *See id.* ¶ 57.[8]

FE 2 heard a rumor, from a Royall development manager who reported to the Royall CFO, that "Advisory Board would be 'basically hands off' of Royall for the first year after the acquisition." *Id.* ¶ 58. Whatever the reason, FE 2 stated that Advisory Board and Royall "were basically like two separate companies" throughout 2015. *Id.* ¶ 52.

### 9. Fourth Quarter 2015: The Corrective Disclosure

On February 23, 2016, Advisory Board issued a press release and held a conference call to discuss its financial results for the fourth quarter of 2015. In the press release, Advisory Board announced a net loss of $101.8 million for that quarter. *See id.* ¶ 110. The net loss was "primarily attributable" to a $95.7 million reduction, or "impairment," of Advisory Board's goodwill associated with Royall. *Id.* ¶¶ 110–111.

During the conference call, Mr. Musslewhite and Mr. Kirshbaum revealed the full extent of Royall's problems. Royall achieved 5% revenue growth in 2015, far lower than the 15% to 21% projected growth. *See id.* ¶ 112. Royall produced $118 million in revenue in 2015, lower than the $125 million to $135 million projected revenue. *See id.* And Mr. Kirshbaum predicted mid-single-digit revenue growth for Royall going forward. *See id.*

Immediately after the February 23, 2016 press release and conference call, Advisory Board's stock price fell another 27%, from $36.29 per share to $26.50 per share. *Id.* ¶ 118.

---

[8] FE 2 was personally involved in integrating the two Salesforce systems, which did not occur until late 2015 or early 2016. *Id.*

Again, analysts attributed the stock drop to Advisory Board's apparently poor returns on the Royall acquisition. *See id.* ¶¶ 114–17. For instance, one analyst wrote:

> The fact that Royall only generated $118M in revenue is painful enough; paying 7x revenue on any business is steep. That is beside the fact that the business is only growing mid-single digits. . . . The lack of a real answer here from management is about as big of a red flag as you can get.

*Id.* ¶ 115.[9]

### C. Procedural History

An Advisory Board shareholder, Plymouth County Retirement Association, filed the current lawsuit in late 2017. *See generally* Compl., ECF No. 1. The Atlanta Pension Funds thereafter secured the Court's appointment as lead plaintiffs. *See* Mot. For Appointment As Lead Pl. at 2, ECF No. 6; Order Appointing Lead Pl. at 1, ECF No. 9. Shortly after, Plaintiffs filed the amended complaint on behalf of the proposed class. *See generally* FAC. They claim that Defendants' conduct described above violated Sections 10(b) and 20(a) of the Securities Exchange Act, and SEC Rule 10b-5. *See id.* ¶¶ 133–42. In response, Defendants filed a motion to dismiss, which is now ripe for the Court's resolution. *See* Defs.' Mot. to Dismiss, ECF No. 18.

### III. LEGAL STANDARD

Section 10(b) of the Securities Exchange Act of 1934 provides that it shall be unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in

---

[9] Advisory Board increased its Royall goodwill impairment to $99.1 million in its 2015 Form 10-K, filed with the SEC on March 11, 2016. *Id.* ¶ 119. The company stated that "[t]he decrease in fair value of the reporting unit from the acquisition was due to reduced projected cash flow growth rates due in part to lower than expected first year performance and lower market derived multiples between the January 9, 2015 acquisition date and the October 1, 2015 goodwill impairment assessment date." *Id.*

contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  SEC Rule 10b-5 closely tracks Section 10(b), providing that, "in connection with the purchase or sale of any security," it is unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]

17 C.F.R. § 240.10b-5.  And to state a claim under Rule 10b-5, a plaintiff must show:

> (1) a material misrepresentation or omission by the defendant;
>
> (2) scienter;
>
> (3) a connection between the misrepresentation or omission and the purchase or sale of a security;
>
> (4) reliance upon the misrepresentation or omission;
>
> (5) economic loss; and
>
> (6) loss causation.

*Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 140 n.3 (2011) (quoting *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)); *see also In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 99 (D.C. Cir. 2015).  Section 20(a) is derivative, subjecting to liability "[e]very person who, directly or indirectly, controls any person liable under" another provision of the Securities Exchange Act or its implementing regulations. 15 U.S.C. § 78t(a).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although

a court need not accept a plaintiff's legal conclusions, the court must assume the truth of all well-

pleaded factual allegations in the complaint and draw all reasonable inferences from those

allegations in the plaintiff's favor.  *See Doe v. Rumsfeld*, 683 F.3d 390, 391 (D.C. Cir. 2012).

In addition to these basic standards, "[s]ecurities fraud class actions must meet the higher,

exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities

Litigation Reform Act (PSLRA)" of 1995.  *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774

F.3d 598, 604 (9th Cir. 2014).  Under Rule 9(b), a complaint must "state with particularity the

circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The PSLRA further requires

that the complaint "specify each statement alleged to have been misleading [and] the reason or

reasons why the statement is misleading," 15 U.S.C. § 78u-4(b)(1)(B), and "state with

particularity facts giving rise to a *strong inference* that the defendant acted with the required state

of mind," *id.* § 78u-4(b)(2)(A) (emphasis added).

## IV.  ANALYSIS

Defendants have moved to dismiss Plaintiffs' complaint on two grounds, which the Court

addresses in turn below.  First, Defendants argue that Plaintiffs have failed "to allege that any

Defendant made a false statement or omission of material fact."  Defs.' Mem. at 4.  Second, they

argue that "Plaintiffs' allegations do not offer a cogent inference of scienter as to any

Defendant."  *Id.*  Defendants' first argument succeeds in significantly reducing the number of

statements and omissions upon which Plaintiffs may rest their claims.  Defendants' second

argument, however, fails to dispose of those surviving statements and omissions.  Plaintiffs'

action thus survives in part.

## A. Defendants' Alleged Material Misrepresentations

To state Section 10(b) and 20(a) claims, Plaintiffs must plausibly allege that Defendants made at least one actionable material misstatement or omission. An actionable misstatement or omission under Section 10(b) and Rule 10b-5 must be both false or misleading *and* material. *See Harman*, 791 F.3d at 99–100, 108. A statement or omission is misleading if a reasonable investor, reading the statement fairly and in context, would be misled. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1330 (2015). In addition, the "statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) (citing *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 586 (D.N.J. 2001)). A statement or omission is material if the stated information or omitted fact "would have 'been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Harman*, 791 F.3d at 108 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 537 U.S. 258, 278 (2014)); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).

"'[S]tatements of reasons, opinions or beliefs' regarding material facts can be actionable, even if these statements contain 'conclusory terms [like "high" value and "fair],'" because these terms, when used 'in a commercial context[,] are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading.'" *Howard v. Liquidity Servs., Inc.*, 177 F. Supp. 3d 289, 304 (D.D.C. 2016) (alterations in original) (quoting *Harman*, 791 F.3d at 108–09). With respect to omissions, a defendant need not immediately disclose to investors all material information. Rather, in general, "a company must disclose information 'when silence would make other statements misleading or false.'" *Phelps v.*

*Stomber*, 883 F. Supp. 2d 188, 211 (D.D.C. 2012) (quoting *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 178 (D.D.C. 2007)).  "The touchstone of the inquiry is . . . whether [the] defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered."  *XM Satellite*, 479 F. Supp. 2d at 178 (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002)).

Plaintiffs' amended complaint quotes extensively from Defendants' public statements made throughout the Class Period.  *See generally* FAC ¶¶ 70–119.  The statements and omissions that Plaintiffs allege were misleading during this period concern six topics: (1) Royall's pre-acquisition revenue recognition practice; (2) Advisory Board's progress integrating Royall; (3) Advisory Board's efforts to cross-sell its products and services to Royall's clients; (4) Advisory Board's decision to write down the value of Royall's goodwill; (5) the departures of Royall's CEO and CFO shortly after the acquisition; and (6) Advisory Board's 2015 revenue guidance.  Despite Plaintiffs' voluminous allegations, the Court concludes that the only actionable statements and omissions were those made on May 5, 2015, regarding Advisory Board's projected revenue.

### 1. Statements Regarding Royall's Revenue Recognition Practice

As a private company, Royall recognized revenue in a different manner than Advisory Board.  Royall at times delayed closing its books for a given quarter so that it could recognize revenue for contracts performed in that quarter, but which were not technically executed until just after the next quarter began.  *See* FAC ¶¶ 42, 95.  Royall could not continue this practice as the subsidiary of a public company—Advisory Board—with more stringent accounting requirements.  *See id.* ¶ 95.  Mr. Kirshbaum explained this difference during the August 4, 2015

conference call. *See id.* He also stated that to reconcile the two practices, Advisory Board would delay recognizing $2 million in revenue in quarter two, 2015 that Royall would have recognized in that quarter. *See id.* Plaintiffs argue that Defendants' failure to explain this difference in its January, February, and May public statements were material omissions. *See id.* ¶¶ 74, 79, 85.

Plaintiffs' claim arising from these alleged omissions fails for several reasons, chief among them a lack of materiality. Plaintiffs assert that the omissions rendered misleading Advisory Board's release of Royall's past financial statements, *see* FAC ¶¶ 73–74, and Advisory Board's 2015 revenue guidance, *see id*. ¶¶ 76, 80. But the record and Plaintiffs' complaint indicate that Royall's practice affected only the *timing* of when Royall recognized revenue, not the amount of revenue that could be recognized. For instance, Royall may have recognized revenue in quarter four, 2012 that should have been recognized in quarter one, 2013, and so on. Royall's total revenue and year-over-year revenue trends, however, would have looked substantially similar regardless of revenue timing. In other words, Plaintiffs do not allege that Royall's revenues were artificially inflated.

Given that Royall's revenue was legitimately earned under either practice, Plaintiffs do not explain why a reasonable investor would have viewed a slight difference in revenue recognition timing as significantly altering the mix of information available.[10] The case that Plaintiffs cite in support of this particular argument, *In re St. Jude Med., Inc. Sec. Litig.*, involved allegations that the defendant public company was unjustifiably "front-loading" sales. 836 F.

---

[10] The magnitude of the omitted information also undercuts its materiality. As noted, Advisory Board reconciled the two companies' revenue recognition practices by merely pushing $2 million in Royall revenue from quarter two to quarter three of 2015. FAC ¶ 95. Royall alone made $118 million in 2015. *Id*. ¶ 112. Plaintiffs fail to show that a reasonable investor would alter his or her decision based on what was essentially a rounding error. *See In re Bos. Sci. Corp. Sec. Litig.*, 686 F.3d 21, 29 (1st Cir. 2012) (questioning the materiality of the defendants' failure to disclose an event responsible for a loss representing "a very small proportion of revenues").

Supp. 2d 878, 905–06 (D. Minn. 2011). Plaintiffs do not raise a similar allegation here; they

acknowledge that Advisory Board discontinued Royall's practice after the acquisition. FAC ¶

95. Because Plaintiffs have failed to show that an earlier explanation of Royall's revenue

recognition practice would be "significant to the trading decision of a reasonable investor," the

omission was not material. *Basic*, 485 U.S. at 234.[11]

### 2. Statements Regarding Royall's Integration

After acquiring Royall, Advisory Board faced the task of integrating Royall's business—

including its sales practices, its products and services, and its administrative systems, such as HR

and finance—into Advisory Board's. Defendants made several public statements during the

Class Period regarding how this integration was proceeding, most of them optimistic. *See, e.g.*,

FAC ¶ 77 ("[W]e are confident that this combination is going to yield great success.") (emphasis

omitted); *id.* ¶ 81 ("The good news here is that integration is moving more quickly than we had

planned . . . .") (emphasis omitted). Plaintiffs argue that the Royall integration's reality was far

different than the rosy picture Defendants painted to investors. In fact, according to Plaintiffs,

"meaningful efforts to integrate Royall" did not begin until 2016, a year after the acquisition. *Id.*

¶ 103; *see also* Pls.' Opp'n at 29 ("[T]he integration failures were ultimately highlighted by

analysts who explained that Royall integration problems led to the disappointing results

---

[11] In addition, Plaintiffs fail to allege that Defendants knew about Royall's revenue recognition practice when they issued the January, February, and May statements. *See In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 883 (8th Cir. 2017) ("[T]he shareholders' claims fail because their allegations do not adequately tie [the defendants'] knowledge of the product quality issues or their financial repercussions to the timing of the statements."). Plaintiffs do argue that Defendants "were, at the very least, extremely reckless in failing to inform themselves of Royall's practice," but that argument rests on the allegation that Defendants "undertook due diligence" before the acquisition. Pls.' Opp'n at 38. The conclusory allegation that Defendants performed due diligence is not sufficient to show that Defendants should have been aware of every accounting technique utilized by Royall, particularly when a technique's impact was less than 2% of Royall's yearly revenue.

announced in February 2016." (emphasis omitted)).  Thus, Plaintiffs contend, Defendants' Class Period statements regarding the Royall integration were materially misleading because they did not disclose that the integration was stalled throughout 2015.

Defendants raise two arguments for why their statements regarding the Royall integration are not actionable.  First, Defendants argue that the statements were not false or misleading when made.  Second, Defendants argue that certain of the statements were "puffery."  Both arguments hold water here.

### a. The Statements Were Not False Or Misleading

Plaintiffs painstakingly detail Defendants' optimistic statements about the Royall integration, but Plaintiffs' arguments fail to place those statements in context.  From the start, according to Defendants, the Royall integration involved multiple "levers" that were intended to proceed along different timelines, some longer than others.  The three levers were sales, product development, and organizational integration.  *See* Defs.' Mem. at 20; Nov. 5, 2015 Earnings Call Tr. at 6 ("We remain focused on 3 key levers: First, driving commercial excellence across sales and renewals and cross-sales in particular; second, capturing the fantastic new product opportunities across the student life cycle presented by the combination of Royall and EAB; and third, ensuring strong organization integration and collaboration."), Defs.' Mem. Ex. 19 at 6, ECF No. 18-20.  Defendants claim that Advisory Board prioritized developing the first two levers in 2015, while addressing organizational integration later in the year and into 2016.  *See* Defs.' Mem. at 20–21.

This contention finds support in the record.  For instance, during the May 5, 2015 call, Mr. Musslewhite stated that Advisory Board "always had a longer integration timeline planned when we acquired [Royall], with the company running a little bit more independently initially."

FAC ¶ 81.  Similarly, during the August 4, 2015 call, Mr. Musslewhite explicitly referred to the three levers.  *See* Defs.' Mem. Ex. 13 at 18 ("For all the integration plan levers, [the departure of Royall's CEO and CFO] has accelerated it [sic].").  During the November 5, 2015 call, Mr. Musslewhite indicated that Advisory Board was beginning to focus on organizational integration.  *See* Defs.' Mem. Ex. 19 at 6 ("[W]e are heavily focused on the organizational integration efforts. . . . my hope is that this strong operational alignment will lead to good Royall results across 2016.").  And during the February 2016 call, Mr. Musslewhite stated that Advisory Board was "bringing Royall online for some key HR, financial, and accounting systems."  Feb. 23, 2016 Earnings Call Tr. at 4, Defs.' Mem. Ex. 21, ECF No. 18-22.

Defendants also note that their statements about the integration were all relative to the "longer integration timeline" that Mr. Musslewhite disclosed to investors in May.  For instance, during that same call, Mr. Musslewhite stated that "integration is moving more quickly *than we had planned*."  FAC ¶ 81 (emphasis added).  Similarly, in August, Mr. Musslewhite stated that "the integration plan is proceeding *ahead of pace*."  *Id.* ¶ 88 (emphasis added).  And in November, Mr. Musslewhite stated that "from an integration and operational standpoint, we are *making good progress* there."  *Id.* ¶ 107 (emphasis added).  Plaintiffs identify no statement in which a Defendant represented that a specific aspect of the integration would be accomplished by a specific period.  Thus, Defendants claim that their optimistic, but general, public statements in 2015 reflected merely that certain aspects of the integration were proceeding as planned, according to the longer integration timeline disclosed to investors, and that other aspects would not begin until the following year.  *See* Defs.' Mem. at 20–21.

Plaintiffs do not contradict Defendants' characterization of Advisory Board's integration plan.  Nor could they.  Plaintiffs' confidential witnesses were relatively lower-level Royall

employees; an Account Coordinator responsible for fifteen Royall clients, and a Senior Data Developer. *See* FAC ¶¶ 45, 47. They provide some insight into specific aspects of the integration, such as Advisory Board's efforts to synchronize administrative functions and Salesforce systems, *see* FAC ¶¶ 52–60, but they provide no insight into Advisory Board's broader integration plan or how the integration actually progressed in comparison to that plan. In fact, FE 2 admitted to being in the dark about Advisory Board's integration plan. *See* FAC ¶ 58 (discussing a "rumor" that "Advisory Board would be 'basically hands off' of Royall for the first year after the acquisition"). It is unclear, then, how Plaintiffs' witnesses could determine whether the integration was proceeding according to plan, as Defendants publicly stated.

In addition, Plaintiffs' witnesses' somewhat contradictory statements in some ways support Defendants' position. FE 2 asserted that no integration took place in 2015; that Royall and Advisory Board "were basically like two separate companies" until 2016. *Id.* ¶ 52. FE 2 also admitted, however, that the two companies exchanged student data in 2015, albeit slowly, *id.* ¶¶ 47, 56, and that the companies' Salesforce software may have been integrated by "the end of 2015," *id.* ¶ 57. And both witnesses stated that "aggressive" cross-selling efforts began "shortly after" Advisory Board acquired Royall. *Id.* ¶¶ 61, 68. These statements do not show that the Royall integration failed to progress according to, or ahead of, plan in 2015, given that Mr. Musslewhite stated early on that the integration would operate on a "longer . . . timeline" with Royall "running a little bit more independently initially." *Id.* ¶ 81. And as noted, Plaintiffs have not shown that their confidential witnesses had access to information confirming that the integration fell behind Advisory Board's plan.

The facts here are not unlike those considered in *Jui-Yang Hong v. Extreme Networks, Inc.*, a case cited by both parties. In that case, the plaintiffs alleged that the defendants publicly

touted the progress of a post-acquisition integration, when in reality the integration was a failure. No. 15-cv-4883, 2017 WL 1508991, at *1–5 (N.D. Cal. Apr. 27, 2017).  In support of their claim, the plaintiffs relied on several confidential witnesses who asserted that integration problems "began immediately after the acquisition and worsened throughout the Class Period." *Id*. at *15.  The court, however, held that the plaintiffs did not demonstrate that the defendants' statements about the integration were misleading when made.  *Id*.  The plaintiffs failed to explain "how or why" their witnesses—lower-level employees—"would have been privy" to the company's integration plan. *Id.* at *16.  "That the [witnesses] personally observed or experienced the [c]ompany's integration efforts [was] insufficient."  *Id*.  The court also found it significant that certain witnesses corroborated the defendants' public statements.  For instance, the plaintiffs' witnesses claimed that "top sales performers" from the legacy company were replaced, which was consistent with the defendants' claim that the integration plan involved "making significant cuts in personnel."  *Id.*  Thus, the plaintiffs' factual allegations were insufficient to support an inference that "statements regarding an integration plan were false when made."  *Id*. at *17.

Similarly, Plaintiffs' witnesses here merely provide snapshots of Advisory Board's Royall integration plan.  And those snapshots could be entirely consistent with Advisory Board's integration plan, even accepting Plaintiffs' allegations as true.  For instance, in February 2015, only one month after the Royall acquisition closed, Mr. Musslewhite touted the integration's "positive momentum" and stated that it was "going very well."  FAC ¶ 77.  While at that point Advisory Board may not yet have merged its HR system with Royall's, it had begun developing its cross-selling pipeline.  *See* FAC ¶ 68 (stating that the Royall "sales team felt pressure soon after the acquisition to quickly grow sales and customers").  Similarly, in May, Mr. Musslewhite

stated that the integration was "moving more quickly than we had planned" and Mr. Kirshbaum asserted that revenue synergies between the two companies were "proceeding as we would expect." FAC ¶¶ 81–82. Again, these statements could just as easily be referring to Advisory Board's efforts at developing new products as to its efforts at merging the two Salesforce platforms. Finally, in August, Mr. Musslewhite stated that he "[felt] good about the path forward, with Royall closely integrated into EAB and *much more closely linked to our sales, renewals, and new product development teams and processes*." *Id.* ¶ 100 (emphasis added). These statements could refer to "the cross-sells already that came through EAB relationships" by that date, *id.* ¶ 102, rather than the offering of Advisory Board health insurance to Royall employees. There is no basis to conclude that the integration was not progressing according to Advisory Board's longer integration timeline—a timeline it disclosed to investors. That Plaintiffs' witnesses "personally observed" particular aspects of Advisory Board's "integration efforts"—without knowing the integration plan—is "insufficient" to show that the integration was falling apart in 2015. *Extreme Networks*, 2017 WL 1508991, at *16.

Plaintiffs' arguments to the contrary are unpersuasive. Plaintiffs rely on *Harman* to assert that their confidential witnesses need not have had personal contact with Advisory Board's leadership to cast doubt on the Royall integration's progress. But the confidential witnesses discussed in *Harman* had personal knowledge of material, undisclosed problems faced by the defendant company. *Harman*, 791 F.3d at 104, 106–07 (discussing the allegations of a sales engineer who knew of a modification that rendered a particular product obsolete, and an account manager who knew the volume of obsolete products held on the company's books). Here, on the other hand, Plaintiffs have not alleged that their witnesses knew or participated in Advisory Board's full integration plan.

Even crediting Plaintiffs' allegations that certain components of the Royall integration did not begin until a year after the acquisition, Plaintiffs have failed to show that the integration lagged behind Advisory Board's internal timeline, to which Plaintiffs' witnesses were not privy. *See XM Satellite*, 479 F. Supp. 2d at 183 ("The PSLRA requires plaintiffs to 'plead with particularity sufficient facts to support [their] beliefs' as to why defendants' statements were misleading." (alteration in original) (emphasis omitted) (quoting *Novak v. Kasaks,* 216 F.3d 300, 313–14 (2d Cir. 2000))). This is particularly true given that Defendants indicated early on that the integration would proceed on a longer timeline, and that Royall would initially run a bit more independently.

### b. Certain Statements Were Inactionable Puffery

Several of Defendants' statements about the Royall integration were also inactionable puffery. "'[S]tatements [that] are too general to cause a reasonable investor to rely upon them' are immaterial and inactionable." *Harman*, 791 F.3d at 109 (quoting *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009)). "'Puffery' refers to one type of immaterial statement: the sort of 'generalized statements of optimism that are not capable of objective verification.'" *Id.* (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)). "Statements that constitute puffery employ terms that are 'too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision.'" *Id.* (quoting *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005)).

*Harman* is instructive on how courts should toe the line between inactionable corporate optimism and actionable assertions. In *Harman*, the D.C. Circuit held that a defendant's statement that sales of a product were "very strong during fiscal 2007" was actionable, not

puffery. *Id*. at 109. The statement was "specific about product and time period." *Id*. It was thus "plausibly understood as a description of historical fact rather than unbridled corporate optimism, *i.e.*, immaterial puffery." *Id*. On the other hand, the court noted, more "generalized boasting" about a company's business is too vague for an investor to evaluate and incorporate into investment decisions, and thus is not actionable. *Id*. at 109–10.

Defendants claim that nine of the integration-related statements challenged by Plaintiffs were "generalized boasting" rather than descriptions of fact that could be evaluated by an investor. *See* Defs.' Mem. at 25–26 (listing nine statements contained in FAC paragraphs 77, 81, 84, 88, and 107). Defendants are correct as to eight of those statements. For instance, Defendants claimed at various points that the integration was "going very well," FAC ¶ 77, that the integration was benefiting from "positive momentum," *id.*, that Defendants were "confident that this combination is going to yield great success," *id.*, that there was "so much excitement" about the integration, *id.* ¶ 84, and that Advisory Board was "making good progress" on the integration, *id.* ¶ 107. These are the types of squishy statements of corporate optimism that an investor could not evaluate and act on. *See Grossman v. Novell, Inc.*, 120 F.3d 1112, 1121–22 (10th Cir. 1997) (holding that a defendant's statements that the defendant company's integration had achieved "substantial success" and was moving "faster than [the defendant] thought" were puffery; *XM Satellite*, 479 F. Supp. 2d at 180 ("[W]hether marketing expenditures are 'cost effective,' 'sound,' 'smart,' or 'efficient' is for the most part a relative and subjective judgement and can 'neither be quantified nor specified in any way.'" (quoting *Cutsforth v. Renschler,* 235 F. Supp. 2d 1216, 1239 (M.D. Fla. 2002))); *Extreme Networks*, 2017 WL 1508991, at *11–12 (holding that "statements that Extreme had substantial success integrating . . . sales teams," statements that a merger was "exceed[ing] . . . expectations" and "going very well," and

"statements in anticipation of synergies resulting from the merger" were not actionable (second alteration in original)); *Melot v. JAKKS Pac., Inc.*, No. CV13-5487, 2016 WL 6902093, at *19 (C.D. Cal. Nov. 18, 2016) (holding that "words and phrases such as 'growing,' 'showing strong momentum,' 'off to a positive start,' 'off to a good start,' and 'off to a solid start'" are "'feel good monikers' that are not actionable.").

Plaintiffs, in large part, fail to respond to Defendants' puffery arguments. Plaintiffs note that Defendants did not argue that *every* challenged statement was puffery. *See* Pls.' Opp'n at 35. This is true, but it does not provide the Court any basis to disregard Defendants' argument that *certain* statements were puffery. As to those statements, Plaintiffs argue that only one was not puffery: Mr. Musslewhite's November 5, 2015 statement that "[w]hen I look at the degree of interaction between multiple, different functional teams and the amount of collaboration across commercial, delivery, technology and central functions like finance, HR and IT, it feels very much like Royall is just as much a part of the Company as any other division." Pls.' Opp'n at 35–36. This statement is closer to an actionable "description of historical fact," *Harman*, 791 F.3d at 109, because it relates to the status of particular Royall functions—finance, HR, and IT— at a particular time—November 2015. It contains verifiable information about the state of Advisory Board's organizational structure. However, Mr. Musslewhite's statement, that "it *feels very much like* Royall is just as much a part of the Company as any other division," is the type of executive-speak that is too "squishy" and "untethered to anything measurable," to support an investment decision." *Id.* at 109 (quoting *City of Monroe Emps. Ret. Sys.*, 399 F.3d at 671); *see also Mazzaferro v. Aruba Networks Inc.*, No. 13-cv-2342, 2014 WL 12680773, at *1 (N.D. Cal. Aug. 1, 2014) (holding that "vague comments such as, 'I feel like we are in the most superior

position' . . . simply express corporate optimism and cannot support a claim for securities fraud").

Not to mention, Plaintiffs have not plausibly alleged that Mr. Musslewhite's statement was misleading when it was made, in November 2015. FE 2 stated that operational and administrative integration of Advisory Board and Royall began "towards the end of 2015 and the beginning of 2016." FAC ¶ 52. FE 2 also stated that Advisory Board began "taking" Royall's student data "sooner than January 2016," FAC ¶ 56, and integrating the two companies' Salesforce systems at "the end of 2015," *id.* ¶ 57. Mr. Musslewhite may have engaged in corporate overexuberance when he stated that it felt like Royall was "as much a part of the Company as any other division," but Plaintiffs' allegations indicate that Advisory Board's and Royall's operations teams *were* interacting and collaborating by that point.[12] Because Plaintiffs have not shown that the statement was false or misleading when made, it is inactionable. *See In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 882 (8th Cir. 2017) ("[E]ven to the extent the claim of 'unmatched speed' could be actionable [non-puffery], the shareholders do not allege any facts demonstrating that the 5G printers are not faster than [a competitor's] other printers or other desktop 3D printers on the market.").

*    *    *

In summary, Plaintiffs cannot rest their securities fraud claims on Defendants' general statements about the Royall integration's progress. First, Plaintiffs have not plausibly alleged that the statements were false or misleading when made. Plaintiffs claim that certain business

---

[12] And Plaintiffs fail to describe Advisory Board's relationships with its other "divisions." If those divisions also operate more independently, as Royall did in 2015, Mr. Musslewhite's "feeling" may not have been incorrect, even given the lack of operational integration.

functions were not integrated between Advisory Board and Royall until 2016, but that claim is not necessarily inconsistent with Advisory Board's longer-term integration plan, a plan that Plaintiffs' witnesses could not speak to. Second, eight statements challenged by Plaintiffs, in complaint paragraphs 77, 81, 84, 88, and 107, are inactionable puffery. *See* Defs.' Mem. at 25–26. They were expressions of corporate optimism that no reasonable investor would rely upon.

### 3. Statements Regarding Cross-Selling Efforts

Advisory Board's Royall acquisition was driven, in part, by the potential for Advisory Board to cross-sell its products and services to Royall's clients, and vice-versa. *See* Jan. 21, 2015 Advisory Board Prospectus at S-3 ("Over time, we aim to realize additional value [from the acquisition] by expanding member relationships across our portfolio and developing new programs based on our joint assets."), Defs.' Mem. Ex. 3, ECF No. 18-4; Defs. Ex. 6 at 6 ("[W]e see tremendous cross-sell opportunities across our thousand-strong joint member base . . . ."). Advisory Board began cross-selling its products and services shortly after the deal closed. *See* FAC ¶ 64 (stating that after the acquisition, "Advisory Board started basically saying, o.k., Royall, give us your client list, we're going to sell all of our products to those people."); *id.* ¶ 68 (stating that the "sales team felt pressure soon after the acquisition to quickly grow sales and customers"). And Defendants touted their cross-selling efforts throughout the Class Period. *See, e.g.*, FAC ¶ 81 ("[E]arly signs lead us to feel good about our future prospects for . . . continued cross-selling of Royall solutions to EAB members and EAB programs to Royall members . . . ." (emphasis omitted)). Plaintiffs claim that these statements were false or misleading because they failed to disclose that "to the extent that there had been an effort to cross-sell EAB's services to Royall customers, those efforts had generally been unsuccessful." *Id.* ¶ 85. Defendants again

argue that the statements were not misleading when made. Defs.' Mem. at 20. Again, the Court agrees.

Although cross-selling opportunities were a key driver of the Royall acquisition, Advisory Board cautioned investors that those opportunities would not necessarily bear fruit in the short term. For example, during the February 11, 2015 conference call, Mr. Kirshbaum stated that "the revenue synergies" and "cross-sell potential" of the Royall acquisition would not "have much impact in calendar '15. It's probably more of an outyear issue." Defs.' Mem. Ex. 6 at 23. Similarly, during the May 5, 2015 call, Mr. Kirshbaum stated that "a lot of the [acquisition's] synergies, mostly through revenue synergies, will coming [sic] in outyears as we work together to pursue joint sales efforts . . . ." May 5, 2015 Earnings Call Tr. at 10, Defs.' Mem. Ex. 10, ECF No. 18-11. And at least some investors internalized those statements. For instance, during the May call, an analyst asked how investors "should . . . think about [revenue synergies between Advisory Board and Royall] over the next 12 to 24 months[.] *Certainly not expecting much of anything over the near term, but as we get into the 2016 time frame*, is this something that really accelerates Royall's growth rate?" Defs.' Mem. Ex. 10 at 19 (emphasis added).

In line with their longer-term projection, Defendants acknowledged limited cross-selling success during the Class Period. Mr. Musslewhite stated, during the May call, that Advisory Board "fe[lt] good about [its] *future prospects* for . . . continued cross-selling of Royall solutions to EAB members and EAB programs to Royall members . . ." FAC ¶ 81 (emphasis added). Similarly, during the August 15, 2015 call, Mr. Musslewhite acknowledged "a couple of cross-

sells already that came through EAB relationships."[13]  *Id.* ¶ 102.  He also stated that "the cross-sell of Royall into Advisory Board members is already—we are moving quickly there" and "you'd see the same thing back into the Royall membership across the next six months."  *Id.* (emphasis omitted).  In other words, Defendants stated during the Class Period that Advisory Board was developing its cross-selling pipeline and that some cross-selling occurred, mostly of Royall's services to Advisory Board's clients, but that the full benefits of Advisory Board's cross-selling efforts would not manifest until later.

Plaintiffs again fail to allege that these statements were false or misleading.  FE 1, a former Royall Account Coordinator, stated that Advisory Board's sales tactics "teed off" or "turned off" some of Royall's customers during the Class Period.  FAC ¶¶ 63–65.  According to FE 1, these tactics "had a significant negative impact" on the number of client contracts Royall renewed in 2015.  *Id.* ¶ 66.  Importantly, however, FE 1 did not claim that Advisory Board failed to sell *any* of its programs to Royall clients in 2015, nor did he claim that Advisory Board clients rejected Royall's offerings.  FE 2 similarly stated that the sales teams "failed miserably" at hitting their sales targets, *id.* ¶ 68, but FE 2 did not describe those targets or the types of sales they called for.[14]  The complaint simply does not sufficiently allege that investors were deprived

---

[13] Certainly, a "couple" of cross-sells is not an exuberant claim, and it puts into context some of Defendants' other non-specific, qualitative statements.  Notably, Plaintiffs' confidential witnesses never assert that *no* cross-sells took place, but rather that cross-selling was an uphill battle.

[14] Again, it is important to place the alleged facts and Defendants' statements into the proper context.  Plaintiffs, and their confidential witnesses, claim that Advisory Board's aggressive cross-selling caused Royall's renewal rates to drop.  *See* Pls.' Opp'n at 31; FAC ¶¶ 61, 66.  FE 1 stated that by June 30, 2015, Defendants "had to have been aware" of dropping renewal rates.  FAC ¶ 67.  And during the first investor call after that date, on August 4, 2015, Defendants acknowledged the low renewal rates and adjusted Advisory Board's revenue guidance downward by several million dollars.  *See id.* ¶¶ 87–89; Defs.' Mem. Ex. 13 at 12, 16. It is thus unclear how the market was deprived of material information regarding the impact of Advisory Board's allegedly deficient cross-selling efforts.

of material information, given that Defendants cautioned the market against the benefits of cross-selling in the short term. *See Howard*, 177 F. Supp. 3d at 309–10 (holding that the defendants were not required to describe an integration in the pejorative terms asserted by the plaintiffs where "[t]hroughout the Class Period, the defendants continued to make disclosures about the significant costs required to fully integrate GoIndustry into LSI, and to acknowledge that GoIndustry was not operating at a profit"); *XM Satellite*, 479 F. Supp. 2d at 180 (holding that "despite the [defendants'] optimistic language" about certain metrics, "no reasonable investor would have expected" those metrics to improve in the short term because the defendants stated that the numbers would deteriorate).

#### 4. Statements Regarding Goodwill

In February 2016, Advisory Board reduced the value of the goodwill associated with Royall on its balance sheet. FAC ¶ 111. This impairment, in large part, caused the company to suffer a $101.8 million loss in quarter four, 2015. *See id.* ¶¶ 110–11. Plaintiffs claim that Defendants were aware in November 2015 that such an impairment was likely. *See id.* ¶ 108 ("[A]s of October 1, 2015, the estimated fair value of the Royall reporting unit did not exceed its carrying value and, therefore, Royall had failed step one of the goodwill impairment test . . . ."). Plaintiffs argue that Defendants' failure to disclose that information during the November 5, 2015 conference call rendered the optimistic statements made during that call—specifically, that Advisory Board was "on track to deliver [its] expectations for the year"—misleading. *Id.* 108. But Plaintiffs have failed to plausibly allege that the impairment had been determined at the time of the November 2015 call.

Plaintiffs plead only one fact indicating that Advisory Board had decided to issue a goodwill impairment as of November 2015: Advisory Board conducted its "annual goodwill

assessment on October 1, 2015." *Id.* ¶ 119 (emphasis omitted) (quoting Advisory Board's March 11, 2016 10-K filing). But as Defendants note, that statement merely indicates that Advisory Board *began* the assessment in October 2015, not that it had *completed* the assessment by November. Defs.' Mem. at 31. The record indicates, in fact, that Advisory Board was still auditing its books as of Defendants' February 23, 2016 conference call. *See* Defs.' Mem. Ex. 21 at 8 (discussing Advisory Board's "preliminary estimate" of the impairment charge, which could change because the company was "still auditing"). Advisory Board did not issue its final goodwill impairment until March 11, 2016. FAC ¶ 119. While Defendants' optimistic statements during the November 2015 call were, in hindsight, incorrect, Plaintiffs have failed to sufficiently plead that those statements were rendered misleading by a failure to discuss a goodwill impairment that had not yet been established. "Fraud cannot be pled by hindsight." *SRM Glob. Fund Ltd. P'ship v. Countrywide Fin. Corp.*, 448 Fed. App'x 116, 118 (2d Cir. 2011) (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994)).

### 5. Failure to Disclose Key Royall Departures

Around April 2015, Royall's CEO and CFO unexpectedly left the company. *See* FAC ¶¶ 45–46, 50. Defendants, however, did not disclose those departures in their May 5, 2015 public statements. *See id.* ¶¶ 80–84. They concede as much. *See generally* Defs.' Mem. Plaintiffs allege that this omission rendered the following public statements, made on May 5, misleading:

- "The good news here is that [the Royall] integration is moving more quickly than we had planned."

- "[E]arly signs lead us to feel good about our future prospects for . . . continued cross-selling of Royall solutions to EAB members and EAB programs to Royall members . . . ."

- "We are pretty early, but [revenue synergies and cross-selling efforts] are proceeding as we would expect."

- "There is so much excitement that we have around Royall . . . ."

- There was "nothing surprising" to Defendants in terms of how the previous quarter compared to their internal expectations.

- "[W]e feel like we are definitely within the zone of [revenue] pacing . . . ."

*Id.* ¶¶ 80–84 (emphasis omitted).[15]

In response, Defendants claim that they simply were not obligated to disclose the departures to investors in May. *See* Defs.' Mem. at 26–28. As noted, "there is no general duty on the part of a company to provide the public with all material information." *XM Satellite*, 479 F. Supp. 2d at 178 (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432–33 (3d Cir. 1997)). "However, under Rule 10b-5, a company has a duty to disclose 'when silence would make other statements misleading or false.'" *Id.* (quoting *Taylor v. First Union Corp.*, 857 F.2d 240, 243–44 (4th Cir. 1988)). And Plaintiffs contend that Defendants' silence regarding the Royall departures made their May 5 statements regarding "Royall's prospects for sales and cross-selling and revenue and earnings expectations" misleading. Pls.' Opp'n at 25. Plaintiffs' allegations do not support this contention, except as to Defendants' statements regarding revenue expectations, which are discussed below.

Otherwise, Plaintiffs fail to connect the Royall departures to the specific statements challenged in the complaint. First, Plaintiffs argue that because the departures would impact Royall sales, renewals, and revenue, at least in the short-term, disclosure of the departures was necessary to make *any* discussion of cross-selling accurate. *See* Pls.' Opp'n at 23–26; FAC ¶ 88 ([T]he CEO and CFO chose to depart earlier than expected, impacting sales and up-sells . . . .") (emphasis omitted). But by May, Mr. Kirshbaum had already told investors that Advisory Board

---

[15] Plaintiffs also allege that the revenue guidance issued on May 5, and Mr. Kirshbaum's statement that the Defendants "feel pretty confident in our numbers for the year," were misleading when made. *See id.* ¶¶ 83, 85. The Court will discuss those particular allegations in greater detail below.

was taking a longer-term approach to cross-selling and product development vis-à-vis Royall, and that revenue synergies from the Royall acquisition would likely not bear fruit until 2016. *See* Defs.' Mem. Ex. 6 at 23 (stating in February that "the revenue synergies" and "cross-sell potential" of the Royall acquisition would not "have much impact in calendar '15."). And Mr. Kirshbaum reaffirmed that guidance during the May call. *See* FAC ¶ 82 ("[A] lot of the synergies through revenue synergies would come in out years . . . ."). Defendants could thus "feel good" about the company's future cross-selling prospects based on "early signs," notwithstanding the short term disruption caused by the Royall departures. *Id.* ¶ 81.

Second, certain of the challenged statements touted the Royall integration's status as of May 5. *See id.* ¶ 81 ("[I]ntegration *is moving* more quickly than we had planned . . . ." (emphasis added)); *id.* ¶ 82 ("We are pretty early, but [revenue synergies and cross-selling efforts] *are proceeding* as we would expect." (emphasis added)). The Royall departures occurred shortly before May 5. *See id.* ¶ 45 (stating that the CEO's replacement addressed Royall employees for the first time on April 15, 2015); *id.* ¶ 90 (stating that the departures happened in "April, early May"). Plaintiffs do not contend that in the short time between the departures and Defendants' statements, Advisory Board's integration plan fell apart. Nor could Plaintiffs, because, as discussed above, their confidential witnesses were not privy to that plan. Thus, it was not misleading for Defendants to state that the Royall integration had gone smoothly in the previous quarter, even suspecting that the departures could possibly impact the integration later. *See Williams v. Globus Med., Inc.*, 869 F.3d 235, 241–43 (3d Cir. 2017) (holding that the defendant was not required to disclose its decision to terminate a distributor relationship when the termination had not yet impacted the company's sales, and the plaintiffs failed to plead "that a drop in sales was inevitable").

For the same reason, Mr. Kirshbaum's statements that he "fe[lt] like [Advisory Board was] definitely within the zone of [revenue] pacing" in May, and that there was "nothing surprising" to him, were not rendered misleading by Defendants' omission. Mr. Kirshbaum was asked whether "anything surprised [him] . . . in the quarter in terms of how [Advisory Board] compared to [its] internal expectations" for revenue and EBITDA. FAC ¶ 83. While the unexpected departures of Royall's CEO and CFO less than a month earlier may have generally been surprising to Mr. Kirshbaum, Plaintiffs have not shown how those departures would have impacted the *previous quarter*'s revenues and EBITDA, the subject of Mr. Kirshbaum's statements.

Plaintiffs seem to argue that because Defendants' May 5 statements related in some manner to cross-selling and integration, Defendants were required to disclose all material information that could also relate to cross-selling and integration. The PSLRA requires greater precision. Plaintiffs must plausibly allege that the *specific statements* challenged were rendered misleading by Defendants' failure to disclose the Royall departures. Plaintiffs have failed to do so with respect to the statements listed above.

### 6. Statements Regarding Revenue Guidance

At several points during the Class Period, Advisory Board issued guidance projecting 2015 revenues for Advisory Board and Royall. *See* FAC ¶¶ 76, 80, 87, 106. Defendants occasionally discussed this guidance in their public statements. *See id.* ¶ 83 ("[W]e feel like we are definitely within the zone of pacing and feel pretty confident in our [revenue and EBITDA] numbers for the year."). Plaintiffs claim that Defendants "lacked a reasonable basis" to issue the guidance, *see, e.g.*, *id.* ¶ 103(b), and that Defendants' May 5, 2015 revenue guidance and accompanying statements were rendered materially misleading by Defendants' failure to disclose

the unexpected departures of Royall's CEO and CFO in April, *see id.* ¶ 85(c), (d).  These claims have merit only as to Defendants' May 5, 2015 guidance.

### a. February 11, 2015 Guidance

On February 11, Advisory Board issued guidance projecting $780 million to $800 million in 2015 revenue, including $125 million to $135 million from Royall.  *See id.* ¶ 76.  Plaintiffs contend that this guidance was misleading because it failed to account for Royall's revenue recognition practice, the stalled Royall integration, and Advisory Board's failing cross-selling efforts.  *See id.* ¶ 79.  However, as discussed above, Plaintiffs have not pleaded facts indicating that Royall's previous revenue recognition practice would impact Advisory Board's 2015 revenue, or that a reasonable investor would consider it significant.  And Plaintiffs have failed to show that the Royall integration was not going according to plan, particularly only one month after the Royall acquisition closed.

In addition, as Defendants note, their February 11 statements informed the market that the February revenue guidance was not contingent on Advisory Board achieving significant synergies from the Royall acquisition in 2015.  *See* Defs.' Mem. Ex. 6 at 23 (stating that "the revenue synergies" and "cross-sell potential" of the Royall acquisition would not "have much impact in calendar '15").  And the guidance was not a "commentary on [Royall's] performance." *Id.* at 20.  A reasonable investor would thus have been on notice that Advisory Board's cross-selling efforts were not materially relevant to the February guidance.  Failure to further discuss those efforts, then, did not render the guidance misleading.  *See Phelps*, 883 F. Supp. 2d at 214 (holding that a public statement was not actionable where "the relevant facts were disclosed and were clearly available to plaintiffs," though not in the precise form the plaintiffs wanted).

*b. May 5, 2015 Guidance*

On May 5, Advisory Board reaffirmed its February guidance: Advisory Board would produce $780 million to $800 million in revenue in 2015, $125 million to $135 million of it from Royall.[16]  *See* FAC ¶ 80.  Mr. Kirschbaum expressed confidence in this guidance during the conference call on that date, stating that Defendants "feel pretty confident in our numbers for the year." *Id.* ¶ 83.  Plaintiffs contend that the guidance was misleading because it failed to account for Royall's revenue recognition practice, the failing Royall integration and cross-selling efforts, and the "sudden" departures of Royall's CEO and CFO in or around April. *Id.* ¶ 85.  Plaintiffs have plausibly alleged that Defendants' failure to disclose the departures was materially misleading.

According to Plaintiffs, Defendants' "reaffirmation of Advisory Board's revenue guidance . . . is actionable because Defendants knew that the (undisclosed) departure of [Royall's CEO and CFO] would have a material impact on sales and revenue." Pls.' Opp'n at 38.  Thus, Plaintiffs argue, Advisory Board "was not on track to achieve its 2015 financial projections" by May, yet Defendants led investors to believe that it was on track. *Id.* at 39.  Again, Defendants do not contest that Royall's CEO and CFO left before May.  Nor do they argue that Advisory Board accounted for the departures in its revenue guidance.  Nor do they dispute that, in hindsight, the departures hurt Royall's 2015 sales and renewals.  Rather, Defendants argue that

---

[16] Advisory Board's May revenue guidance did not explicitly reaffirm the Royall guidance issued in February. Defs.' Mem. Ex. 9 at 8.  In theory, then, the guidance *could have* incorporated a lower revenue projection for Royall, and higher projections for other Advisory Board business units.  *See Williams*, 869 F.3d at 246 (holding that the plaintiffs' revenue projections were inactionable because the plaintiffs did "not plead[] any facts to support their claim that [the defendant company] incorporated anticipated revenue from" a cancelled supplier contract in those projections).  However, Defendants did not raise this issue, and the parties seem to assume that Advisory Board implicitly reaffirmed the Royall guidance in May, along with the Advisory Board guidance. *See* Defs.' Mem. at 32.

"any such calculus [about the Royall departures] made as of May 5 would have been pure speculation." Defs.' Mem. at 28. In other words, Defendants argue that the May revenue guidance was not materially misleading because it was impossible for Advisory Board to account for the Royall departures at that time.[17]

Defendants' own statements in August 2015 make clear that the Royall departures materially harmed Royall's 2015 renewals and up-sells. Mr. Musslewhite stated that Royall's "CEO and CFO chose to depart earlier than expected, impacting sales and up-sells during a critical time and distracting the organization." FAC ¶ 88 (emphasis omitted). He further explained that the two executives "had their hands very tightly controlled around if there was any sales management," that they sat "on top of the business and steer[ed] the bus," and that the CEO was "personally involved in a lot of the up-sell and cross-sell type conversations and had some relationships." Id. ¶ 91. And Mr. Kirshbaum stated that the departures resulted, among other reasons, in Royall "not capturing as many new clients or up-sell opportunities as the prior years." Id. ¶ 89. Plaintiffs' confidential witnesses corroborate those statements. For instance, FE 2 stated that the departures created uncertainty among Royall's customers and "hindered [Royall's] sales efforts." Id. ¶ 48.

Although Defendants may not have been able to quantify the Royall departures' impact in May 2015, it is plausible to infer that the departures, which occurred after the February revenue guidance was issued, made it more likely that Royall would ultimately underperform that guidance. A reasonable investor would have found that information significant. *Cf.*

---

[17] Defendants similarly argue that they "could not have foreseen, as of May 5, 2015, what impact [the departures] would have on Royall before the critical spring sales season ended on June 30." Defs.' Mem. at 28. While couched as a materiality argument, it is more properly analyzed as an argument that Defendants lacked the necessary state of mind to be held liable for their May statements. The Court will analyze this argument below, in its discussion of scienter.

*Howard*, 177 F. Supp. 3d at 306 ("[E]ven if the [defendant company's] financial statements were not themselves inaccurate, the defendants' public statements publicizing the strong performance of divisions, which were in fact doing poorly, are material because these statements 'would be viewed by the reasonable investor as having significantly altered the total mix of information made available.'" (quotation marks omitted) (quoting *Basic*, 485 U.S. at 231–32)).  Instead, with no caveat, Advisory Board told investors that Royall would achieve the same revenue it had been projected to achieve before the departures.  Plaintiffs have thus plausibly alleged that Defendants' revenue reaffirmation was misleading by omission.  *See Harman*, 791 F.3d at 105 (holding that the plaintiff stated a Section 10(b) claim where the defendant touted "its plan to reduce its substantial inventory" but "did not disclose historical facts that could have affected the success of the plan being discussed"); *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 249, 263–66 (3d Cir. 2009) (holding that a company's "reaffirmed projections of revenue and margins were . . . no longer sound (and were thus misleading)" when the company experienced significant pricing pressure during the previous quarter, yet failed to disclose that pressure); *Howard*, 177 F. Supp. 3d at 306 (holding that "misrepresentations regarding the financial performance of the two business components that the defendants . . . publicly touted as growing with healthy margins [were] clearly material").

Defendants' reliance on *Boston Scientific* and *Williams* is unpersuasive because those cases involved more speculative risks than the risk faced by Defendants in May 2015.  In *Boston Scientific*, the defendant company and its executives issued a series of statements in late 2009 and early 2010 touting the company's positive sales outlook and successful sales force.  *In re Bos. Sci. Corp. Sec. Litig.*, 686 F.3d 21, 24–26 (1st Cir. 2012).  The company did not disclose, however, that it was in the process of firing a key regional vice president of sales and several

sales reps, who would defect to a competitor. *Id.* at 28–29. The plaintiffs claimed that the company's positive statements about its sales force were rendered materially misleading by the company's failure to disclose the firings. *Id.* at 27–28. The First Circuit disagreed, for the most part. *Id.* at 28. It concluded that the "main risk" to the company was that the fired sales reps would "take business with them." *Id.* at 29. Thus, the company's failure to disclose the firings was not material *before* they occurred because the risk of lost business was uncertain then. *Id.* at 28. The omission was still not material after the firings occurred, but before the disgraced reps were hired by a competitor, because it was "not plainly foreseeable" that the reps would flee to a competitor and take business with them. *Id.* at 29. The firings were particularly immaterial at that time because the company predicted lost sales of, at most, one percent of its annual revenues. *Id.*

Halting there, Defendants argue that *Boston Scientific* is analogous to this case. According to Defendants, the Royall departures were not material in May because their impact was not foreseeable, like the impact of the sales rep firings in *Boston Scientific* was not foreseeable before the reps were hired by a competitor. Defendants, however, ignore the rest of *Boston Scientific*'s materiality analysis.

The fired regional vice president in *Boston Scientific* was hired by a competitor in January 2010, after which the company's CEO made additional positive statements about the company's sales force. *Id.* at 25; *In re Bos. Sci. Corp. Sec. Litig.*, No. 10-cv-10593, 2011 WL 4381889, at *2 (D. Mass. Sept. 19, 2011). While the "main risk" to the company—that the fired reps would take business with them—may not have been foreseeable before these statements were made, the risk had manifested by then. The district court determined that it was reasonable to infer that the company's executives "knew, at that time, that the[] terminations *may* have *some*

42

impact on the [c]ompany's . . . revenues." *Bos. Sci.*, 2011 WL 4381889, at *12. Given this inference, the court concluded that "the 'total mix of information' available to investors may have been somewhat 'skewed' by the lack of disclosure of the terminations." *Id.* (citing *Lormand*, 565 F.3d at 249). The court thus held, and the First Circuit did not disturb, that the company's failure to disclose the sales rep firings was material. *Id.* at 14. Similarly here, the Royall departures' risk to Advisory Board's business—the loss of key sales relationships—had manifested before the May 2015 statements. Plaintiffs have pled that the departures would foreseeably have some impact on Royall's sales and renewals. It is thus reasonable to infer that the departures, like the sales rep departures in *Boston Scientific*, would have materially impacted the mix of information available to investors.

*Williams* is also inapposite. The plaintiff in that case challenged a company's failure to disclose, when issuing earnings guidance, its decision to terminate its agreement with a distributor. 869 F.3d at 238. That termination ultimately caused a material drop in the company's sales. *Id.* at 239. However, when the company issued the guidance, the distributor was still distributing the company's products, the company had "spent months preparing to end its relationship" without an impact on sales, and the plaintiffs failed to adequately plead that the company's executives "should have expected" the negative financial impact that ultimately occurred. *Id.* at 242–43. Here, on the other hand, when Defendants issued the May guidance, the Royall executives had recently and unexpectedly left, and the complaint's allegations plausibly support an inference that Defendants understood, at the time, the impact the departures would have on revenues.[18]

---

[18] *Andropolis v. Red Robin Gourmet Burgers, Inc.*, upon which Defendants also rely, is even more inapplicable to the facts of this case. *Red Robin* involved a company's failure to disclose the *reason* for its CFO's departure, having disclosed the departure itself. 505 F. Supp.

Defendants also note that "the maximum measure of [the Royall departures'] impact on 2015 sales [was] a mere 0.9% to 2.2% of the Advisory Board's revenue," Defs.' Mem. at 28, potentially less than the impact the First Circuit found immaterial in *Boston Scientific*. It is true that "information regarding a small business segment that is unlikely to affect the future of the entire company is generally not material." *Howard*, 177 F. Supp. 3d at 310 (citing *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 174 (3d Cir. 2014)). But again, the touchstone of materiality is whether information "may affect the desire of investors to buy, sell, or hold the company's securities." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001). Thus, if information could impact a reasonable investor's decision making, the information's importance to the company's bottom line is largely irrelevant. For that reason, though the product at issue in *Harman* was a "rather small component of" the company's "total portfolio," statements regarding the product were material because it was "part of the [c]ompany's largest division and had been the focus of recent public statements." 791 F.3d at 109. Likewise here, while the Royall departures made a small dent in Advisory Board's overall revenues, they were a key development in Advisory Board's largest acquisition ever, an acquisition that had generated significant investor interest. A reasonable investor would consider the departures material to Advisory Board's revenue outlook.[19]

2d 662, 686 (D. Colo. 2007). The court found that omission immaterial, both because no SEC regulation mandated the disclosure, and because the plaintiff failed to sufficiently allege that "had [the defendant] disclosed the reasons for [the CFO's] termination . . . a 'reasonable investor' would have considered the disclosure important." *Id.* at 688. Here, to the contrary, a reasonable investor would have considered the Royall departures important, regardless of SEC regulations.

[19] The market's reaction after the departures were disclosed on August 4 provides additional evidence that the Royall departures were material. *See Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("[W]hen a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock."); *XM Satellite*, 479 F. Supp.

Finally, Defendants argue that their "statements regarding revenue guidance" are protected by the PSLRA's safe harbor provision. Codified at 15 U.S.C. § 78u-5(c)(1)(A)(i), the safe harbor protects "forward-looking statement[s]" that are "identified as . . . forward-looking statement[s], and [are] accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[s]."[20] Even in the absence of meaningful cautionary language, a forward-looking statement is protected unless it was made "with actual knowledge . . . that the statement was false or misleading." *Id.* § 78u-5(c)(1)(B)(i); *see also In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1149 (9th Cir. 2017); *In re Harmon Int'l Indus., Inc. Sec. Litig.*, 27 F. Supp. 3d 26, 40–41 (D.D.C. 2014), *rev'd on other grounds*, 791 F.3d 90 (D.C. Cir. 2015). The second form of safe-harbor protection—the actual knowledge requirement—relates to Defendants' scienter, discussed below. The first form—meaningful cautionary language—does not help Defendants here.

Meaningful cautionary language "calls for substantive company-specific warnings tailored to the specific future projections, estimates or opinions in the [statements] which the plaintiffs challenge." *Howard*, 177 F. Supp. 3d at 308 (alteration in original) (quoting *Harman*,

_____

2d at 182 (evaluating an analyst's response to information in determining whether that information was material). Advisory Board's stock price fell 21% over the next day. *See* FAC ¶ 96. And analysts attributed that drop, at least in part, to the Royall departures. *See id.* ¶ 97 (quoting analysts' reports that, in selling off Advisory Board's shares, "investors seemed to largely ignore the strength in the core healthcare and focus instead on the Royall sales weakness," and that "most of the Royall weakness was due to executives leaving"); *id.* ¶ 94 (quoting an analyst's report that "[t]he unanticipated departure of Royall's CEO and CFO weighted heavily on the critical June Q sales period").

[20] Plaintiffs concede that the May 5 statements regarding revenue guidance are "forward-looking" under the PSLRA. *See* 15 U.S.C. § 78u-5(i)(1)(A), (C) (categorizing "a projection of revenues" and "a statement of future economic performance" as forward-looking); *Avaya*, 564 F.3d at 254–55 (holding that the defendants' statement that they were "on track to meet [their] goals for the year" was forward-looking). Rather, Plaintiffs argue that those statements do not meet the PSLRA's other requirements for safe harbor protection. *See* Pls.' Opp'n at 38–41.

791 F.3d at 102). "Cautionary language cannot be 'meaningful' if it is 'misleading in light of historical fact[s].'" *Harman*, 791 F3d at 102 (quoting *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 770 (2d Cir.2010)).

In determining when cautionary language is sufficiently meaningful, *Harman* is again instructive. In that case, the D.C. Circuit considered whether the defendants included adequate cautionary language when they issued a sales forecast for a specific product, and announced an ambitious sales drive to reduce their inventory of that product. 791 F.3d at 96–97. The forecast warned that the company's product inventory had grown significantly, and that its sales could suffer if the company "failed to 'develop, introduce and achieve market acceptance of new and enhanced products.'" *Id*. at 104. According to the plaintiffs, the sales forecast was misleading because the defendants knew that the company held a "large inventory of older generation, obsolete [products] which" the company "could not sell or was forced to sell at a substantial loss." *Id*. at 105. Taking that fact as true, the D.C. Circuit held that the company's warnings were insufficient to provide safe harbor protection for the statement at issue. *Id.* Although the defendants' cautionary statements suggested that obsolescence could become a problem in the future, the statements did not disclose the "obsolescence that had already materialized" and that posed a significant threat to Defendants' forecast. *Id*. at 104. In other words, "[e]ven if viewed as implicitly raising the specter of obsolescence, the statements were insufficient for at least the reason that they did not warn of actual obsolescence that had already manifested itself." *Id*. Thus, "the purportedly cautionary statements were not meaningful because they were misleading in light of historical fact." *Id.*

Like the cautionary language in *Harman*, Advisory Board's May 5 warnings ignored facts existing at the time they were issued. In relevant part, the May 5 press release stated that

Advisory Board could "fail[] to realize the anticipated benefits of the Royall acquisition," and that its financial condition could be harmed by the "diversion of management's attention from operations by activities focused on the integration of Royall's business." Defs.' Mem. Ex. 9 at 9. Advisory Board's form 10-KT, which the May guidance incorporated by reference, stated that the company's financial condition would be "adversely affected" if the company was "unable to integrate successfully Royall's operations into [its] own." Form 10-KT Transition Report at 7, Defs.' Mem. Ex. 7, ECF No. 18-8. The 10-KT also stated that the "diversion of management's attention [because of the acquisition] and any difficulties encountered in the transition and integration process could otherwise harm [its] business, financial condition, and operating results." *Id.* Finally, the 10-KT stated that "[d]elays in successfully integrating and managing employee benefits could lead to dissatisfaction and employee turnover." *Id.*

These general warnings suggest that management turnover *could* impact Advisory Board's ability to realize the full benefits of the Royall acquisition. But by the time of Defendants' May statements, key management turnover *had already occurred*. And Defendants have not identified any cautionary language addressing that turnover, warning investors that the recent departures of Royall's top two executives could impair Royall's sales during its critical season. *See XM Satellite*, 479 F. Supp. 2d at 185 (holding that a company's cautionary language was adequate when the company predicted that certain metrics would decrease or stabilize, but warned that consumer demand and advertising could cause those specific metrics to increase). Even reading Defendants' May warnings broadly, the warnings "identifie[d] a potential risk, but 'impl[ied] that no such problems were on the horizon [though] a precipice was in sight.'" *Harman*, 791 F.3d at 102 (quoting *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 733 (7th Cir. 2004)). Such language is inadequate to meet the safe harbor standard because it "fail[ed] to account for

the materialization, rather than abstract possibility, of the important risk posed by" Royall's management turnover.[21]  *Id.* at 106; *see also Howard*, 177 F. Supp. 3d at 308 (holding that the warning that "increased competition may result in reduced operating margins and loss of market share" was not meaningful when "increased competition had *already resulted in* reduced margins and loss of certain customers" (emphasis added)).[22]

### c. August 4, 2015 and November 5, 2015 Guidance

On August 4, Advisory Board reduced the top end of its 2015 revenue guidance from $800 million to $790 million.  FAC ¶ 87.  Mr. Kirshbaum clarified during the August 4 call that the company reduced its guidance "to account for the impact of Royall performance."  Defs.' Mem. Ex. 13 at 10.  Mr. Musslewhite further explained that "from a growth perspective Royall ha[d] not yet performed as [they] expected."  *Id.*; FAC ¶ 88.  Despite these disclosures, Plaintiffs assert that Advisory Board should have gone farther, that it "lacked a reasonable basis" for even the reduced revenue guidance.  FAC ¶ 103.  Thus, according to Plaintiffs, the amended guidance was misleading because it still painted too rosy a picture of Advisory Board's financial condition.  *See* Pls.' Opp'n at 39.

---

[21] This conclusion is reinforced by the fact that "the Company's cautionary statements remained unchanged" throughout the Class Period, "despite a significant change in circumstances of material importance."  *Harman*, 791 F.3d at 107.  For instance, both the May and August press releases warned generally of Advisory Board's "failure to realize the anticipated benefits of the Royall acquisition," and "diversion of management's attention" due to the Royall integration.  *See* Defs.' Mem. Ex. 9 at 9; Defs.' Mem. Ex. 12 at 10, ECF No. 18-13.  Yet between May and August, the deleterious impact of the Royall departures had become apparent.  As the D.C. Circuit stated in *Harman*, "'[t]he consistency of the defendants' language over time despite' changing circumstances 'belies any contention that the cautionary language was 'tailored to the specific future projection.'"  *Harman*, 791 F.3d at 107 (quoting *Slayton*, 604 F.3d at 773).

[22] Defendants also argue that the February, August, and November revenue guidance falls within the PSLRA's safe harbor.  Defs.' Mem. at 34.  But the Court need not address that argument, because Plaintiffs have failed to show that the guidance was misleading when issued.

Plaintiffs' complaint does not identify any facts that contradict the August and November guidance; it merely asserts that the guidance lacked a "reasonable basis." FAC ¶¶ 103(b), 108(c). Plaintiffs' opposition brief provides more color. It asserts that the guidance "still underestimated the likely impact on sales and revenue caused by the departure of [Royall's CEO and CFO] because Defendants knew the impact would reverberate in 2016." Pls.' Opp'n at 39.

But Plaintiffs' complaint and the record indicate that Advisory Board accounted for the Royall departures in reducing its revenue guidance. During the August 4 call, Defendants stated that "management turnover" hurt Royall's "sales and up-sells" and distracted the organization. FAC ¶¶ 88–89. Those effects would, at least in part, cause Royall's revenues to "be below the low end of" the company's initial projection "by several million dollars." Defs.' Mem. Ex. 13 at 12, 16. And the effects would continue to deflate Royall's revenues in the second half of 2015 and into 2016. FAC ¶ 89. The revenue guidance *was* thus informed by "the likely impact on sales and revenue caused by" the Royall departures, and the market knew it. Pls.' Opp'n at 39.

It appears, then, that Plaintiffs simply disagree with Advisory Board's August and November guidance, given that the guidance proved to be inaccurate. But "[t]he fact that [Advisory Board's] performance did not conform to that predicted supports no inference that [the company's] statements lacked a reasonable basis when made." *Kowal v. MCI Commc'n Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994). And Plaintiffs fail to plausibly allege that the August and November guidance lacked a reasonable basis when made. Plaintiffs' claims based on this guidance are thus "fraud by hindsight" for which Section 10(b) provides no recourse. *XM Satellite*, 479 F. Supp. 2d at 176 ("Where fraudulent projections are alleged, the plaintiff[s] must . . . identify in the complaint with specificity some reason why the discrepancy between a company's optimistic projections and its subsequently disappointing results is attributable to

fraud." (alteration in original) (quoting *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 209 (4th Cir.1994))).

### 7.  Summary of the Alleged Material Misrepresentations

Plaintiffs have sufficiently alleged that Advisory Board's revenue guidance issued on May 5, 2015, and Mr. Kirshbaum's statement in support of that guidance, were materially misleading because they failed to account for the sudden departures of Royall's CEO and CFO. *See* FAC ¶¶ 80, 83; Defs. Mem. Ex. 9.  At the very least, those public statements were rendered misleading by Defendants' failure to disclose the departures.  On the other hand, Plaintiffs have failed to identify any other statement or omission attributable to Defendants during the Class Period that was materially false or misleading.  Defendants' motion to dismiss is thus granted with respect to those statements or omissions identified in the complaint, other than the May 5, revenue-related statements.

### B.  Scienter

Plaintiffs have sufficiently alleged that the revenue guidance issued by Defendants on May 5, 2015, and Mr. Kirshbaum's accompanying statement, were rendered materially misleading by Defendants' failure to disclose the Royall departures.  To state a Section 10(b) claim, however, Plaintiffs' allegations must also give "rise to a strong inference that the defendant[s] acted with the required state of mind" in issuing the misleading guidance.  *Harman*, 791 F.3d at 100 (quoting 15 U.S.C. § 78u-4(b)).  Plaintiffs must plausibly allege facts such that a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Howard*, 177 F. Supp. 3d at 311 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007)).  In making this

determination, "the [C]ourt's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326.

Section 10(b) and Rule 10b-5 liability normally require a mental state embracing "intent to deceive or defraud, or extreme recklessness to that effect . . . ." *Lorenzo v. SEC*, 872 F.3d 578, 589 (D.C. Cir. 2017); *see also Liberty Prop. Trust v. Republic Props. Corp.*, 577 F.3d 335, 342 (D.C. Cir. 2009) (quoting *SEC v. Steadman*, 967 F.2d 636, 641 (D.C. Cir. 1992)). As discussed above, however, a plaintiff seeking to impose liability for a forward-looking statement must show "actual knowledge" that the statement was false or misleading. 15 U.S.C. § 78u-5(c)(1)(B)(i). The question here, then, is whether Plaintiffs' have met that burden with respect to Defendants' May 5, 2015 revenue guidance and the accompanying statement.

Defendants concede that they knew about the Royall departures by May 5. This knowledge is necessary, but not sufficient to make out a Section 10(b) claim. Plaintiffs must also plausibly allege that Defendants knew, on May 5, that the Royall departures would likely cause the company to miss its revenue projections. And to that point, Plaintiffs argue that Defendants "understood, at the time of [the Royall departures], the impact the departure[s] would have on Royall's sales, cross-selling, and revenue and earnings estimates." Pls.' Opp'n at 24. This is a close case, but the Court concludes that Plaintiffs' allegations plausibly support their argument.

Plaintiffs have alleged "strong circumstantial evidence" that Defendants closely monitored the Royall acquisition. *See Howard*, 177 F. Supp. 3d at 312 (quoting *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. App'x 10, 13 (2d Cir. 2011)) (holding that strong circumstantial evidence can support a finding of scienter). It was Advisory Board's largest acquisition ever. *See* FAC ¶ 39. Defendants touted the diligence devoted to it. *See id.* ¶ 78.

Defendants often referred to the acquisition, and Royall's performance, in their public statements. *See, e.g.*, *id.* ¶ 77 ("[T]here is a lot of positive momentum on both sides and we are confident that this combination is going to yield great success") (emphasis omitted); *id.* ¶ 81 ("[W]e are having some key early wins around introducing Royall's world-class enrollment managed services to education advisory board members."). And those statements indicated that the Royall acquisition's success was a key priority for Advisory Board in 2015. *See* Defs.' Mem. Ex. 10 at 19–20 (stating, when asked about Advisory Board's merger plans going forward, that "[t]here is so much excitement we have around Royall and so much upside from a lot of the things we've talked about on this call that I think that's really going to occupy our growth efforts around the higher ed side.").

Given the attention Defendants paid to the acquisition and Royall's subsequent performance, it is plausible to infer that Defendants understood the key drivers of that performance. *See Avaya*, 564 F.3d at 271 (holding that, when the defendant company's "operating margin was viewed as so important to the health of the company (and its attractiveness to investors) that its supposed ability to hold and grow this margin was described as the 'Avaya story,'" it was plausible to infer that the company's CFO "was paying close attention to these numbers"); *Howard*, 177 F. Supp. 3d at 313 (holding that the plaintiffs plausibly alleged that the defendants were aware of certain business segments' weak financial performance, when the defendants "often referred to metrics" that were relevant to those segments).

Plaintiffs have also alleged strong circumstantial evidence that Defendants had an idea of how important Royall's CEO and CFO were to Royall's performance. Defendants implied a close working relationship between the two companies' executives. *See* FAC ¶ 77 (stating, in

February 2015, that "John Nester, Royal & Company's CEO, has been great to work with and his team is strong"). Advisory Board was negotiating five-year contracts with Royall's CEO and CFO when they left the company. Defs.' Mem. Ex. 13 at 12. The departures occurred in the middle of Royall's key sales period, the "critical time," between January and the end of June. *See* FAC ¶¶ 88–89. Only three months after Defendants' May statements, they acknowledged that Royall's poor performance was due in large part to the Royall departures. *Id.* ¶¶ 88–91. And, critically, Mr. Musslewhite admitted in August that Royall's CEO and CFO "had their hands very tightly controlled around . . . sales management," and that Royall's CEO was "personally involved in a lot of the up-sell and cross-sell type conversations and had some relationships." *Id.* ¶ 91 (emphasis omitted).

Thus, at least at the pleading stage, "*all* of the facts alleged, taken collectively, give rise to a strong inference" that Defendants knew in May that the Royall departures would likely cause Royall to miss its revenue expectations.[23] *Tellabs*, 551 U.S. at 323 (emphasis in original). Defendants were intimately involved in the Royall acquisition and worked closely with Royall's

---

[23] Plaintiffs also argue that Defendants were "motivated to conceal the truth" about Royall's lagging performance "in order to secure approval at the June 9, 2015 annual meeting of Advisory Board stockholders for their significantly higher [2014] compensation." FAC ¶ 123. Plaintiffs acknowledge that the shareholder vote was retrospective, governing Defendants' compensation for the year *before* the Royall acquisition. *Id.* The vote was thus entirely disconnected from the success of the Royall acquisition. Plaintiffs' argument, at its core, is that Defendants were motivated to keep Advisory Board's stock price stable so that shareholders would not penalize them for their 2015 performance by docking their 2014 pay. But, as Defendants note, profit motive alone is insufficient to support a strong inference of scienter, or else securities fraud plaintiffs would have no trouble pleading that any individual executive acted with scienter. *See Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) ("[A]n allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient because such a desire can be imputed to all corporate officers."); *Stevens v. InPhonic, Inc.*, 662 F. Supp. 2d 105, 124 (D.D.C. 2009). Nonetheless, the facts pled here permit a strong inference of scienter even without Defendants' alleged compensation-based incentive. *See Avaya*, 564 F.3d at 279–80 (finding scienter based on circumstantial evidence, without sufficient allegations of insider trading or related motives).

leadership.  It is thus reasonable to infer that Defendants understood the importance of Royall's

CEO and CFO to the company's client relationships.  True, Defendants may not have known the

full extent of that impact until the flagging sales numbers became apparent in late June.  FAC ¶

67.  But Plaintiffs have plausibly alleged that Defendants knew enough in May to understand that

the revenue projection issued in February was less likely to come to fruition, and thus that

reaffirming that same guidance would mislead investors without an appropriate disclaimer.  *Cf.*

*Avaya*, 564 F.3d at 270 ("Even if [the CFO] were not aware of the full extent of the unusual

discounting . . . he might be culpable as long as what he knew made obvious the risk that his

confident, unhedged denials of unusual discounting would mislead investors."); *In re Symbol*

*Techs., Inc. Sec. Litig.*, No. 05-cv-3923, 2013 WL 6330665, at *7–8, (E.D.N.Y. Dec. 5, 2013)

(holding that a company's revenue projections were materially misleading when the company

knowingly failed to disclose the poor internal controls inflating the projections).

Defendants proffer the following inference to be drawn from these facts: "Defendants

were excited and optimistic about the Royall acquisition at the time of the merger," and "they

timely disclosed negative information about the acquisition as they learned it."  Defs.' Mem. at

40.  Plaintiffs' allegations, however, contradict the inference that Defendants timely disclosed

negative information; Defendants learned of the Royall departures before May, yet failed to

disclose them.  At the very least, the inference that Defendants knew that the Royall departures

would negatively impact their revenue projections is "at least as compelling as" Defendants'

inference of mere excitement and optimism.  *Howard*, 177 F. Supp. 3d at 311.  Plaintiffs have

thus plausibly alleged scienter.

### C. Defendants' Section 20(a) Liability

Section 20(a) imposes joint and several liability upon individuals who exercise control over a Section 10(b) violator, typically a corporation. *See Harman*, 791 F.3d at 111. Thus, "[a] claim under Section 20(a) can exist only if there is a viable claim against the corporation." *Id.* Here, Plaintiffs claim that Mr. Musslewhite and Mr. Kirshbaum, Advisory Board's CEO and CFO during the Class Period, were "controlling persons" who culpably participated in Advisory Board's, and their own, underlying violations of Section 10(b) and Rule 10b-5. *See* FAC ¶¶ 138–41. Defendants' only argument in opposition is that Plaintiffs failed to adequately plead Section 10(b) and Rule 10b-5 violations. *See* Defs.' Mem. at 41. Because, as discussed above, Plaintiffs have plausibly alleged that Advisory Board committed Section 10(b) and Rule 10b-5 violations with respect to the May 5, 2015 revenue guidance, Defendants' motion to dismiss Plaintiffs' Section 20(a) claim is denied as to that allegation.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 18) is **DENIED** with respect to Advisory Board's May 5, 2015 revenue guidance and Mr. Kirshbaum's statement, recounted in paragraph 83 of Plaintiffs' amended complaint, regarding that guidance. Defendants' Motion to Dismiss is **GRANTED** as to the remainder of Plaintiff's complaint. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: March 29, 2019                                                 RUDOLPH CONTRERAS
                                                                     United States District Judge